828 A.2d 995

**SUMMIT TOWNE CENTRE, INC., a Pennsylvania Corporation, Appellee**

**v.**

**The SHOE SHOW OF ROCKY MOUNT, INC., a North Carolina Corporation, d/b/a Shoe Department, Appellant.**

Supreme Court of Pennsylvania.

Argued March 4, 2003.

Decided July 21, 2003.

Geral J. Stuberhofer, Pittsburgh, for Shoe Show of Rocky Mount, Inc., a NC Corp., d/b/a Shoe Dept., Appellant.

Richard A. Lanzillo, Wallace John Knox, Erie, for Summit Towne Centre, Inc., a PA Corp., Appellee.

Before CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR and LAMB, JJ.

### OPINION OF THE COURT

JUSTICE NIGRO.

The question presented in this case is whether the Superior Court erred in reversing the trial court's denial of a requested preliminary injunction. We hold that it did.

Appellee Summit Towne Centre, Inc. ("Summit"), a Pennsylvania corporation, owns and operates the Summit Towne Centre ("Centre"), a shopping center located in a "power shopping district" in Millcreek Township, Erie County. The Centre's 550,000 square feet of retail space are divided between twenty to thirty retail and business tenants, including such large "anchor" establishments as Giant Eagle, K–Mart, and Sam's Club, as well as smaller "in-line" tenants such as Fashion Bug, Volume Shoes, and Hallmark Cards. Summit's management strategy has been to maintain a degree of variety among the types of businesses in the Centre, and also to cluster its tenants by retail genre.

Summit leased one of its smaller "in-line" retail units, a single-room, 5,400 square foot space, to Appellant The Shoe Show of Rocky Mount, Inc. ("Shoe Show"),[1] a North Carolina

1. Apparently in pursuit of its strategic clustering of retailers, Summit leased a space to Shoe Show that was proximate to three clothing merchants: Marshall's, Fashion Bug, and Dot's. In 1996, however, the

corporation operating approximately 700 retail footwear stores in twenty-seven states under the names "Burlington Shoes," "Shoe Department," and "Shoe Show." The parties' lease agreement covered a ten-year period commencing August 21, 1992, and required Shoe Show to pay a base rent as well as a percentage of its gross sales above a predetermined "break-point" figure. In addition, the forty-eight page lease agreement contained a "use" provision, which provided, in pertinent part:

### 6. Use

Tenant agrees that the Demised Premises shall be occupied by no other person or entity except upon and with the written consent of Landlord first had, and shall be used for the sole purpose of the operation of a first-class modified rack family shoe store specializing in retail sale of brand name dress, casual, sport and work shoes, as well as handbags, hosiery and other related accessories. Tenant recognizes that the specific limited use prescribed herein is a material consideration to Landlord in order that the Shopping Center will maintain an appropriate tenant mix.

\* \* \*

Tenant agrees to keep its Demised Premises adequately illuminated and continuously and uninterruptedly open for business during the same days, nights and hours as any department store or stores located in the Shopping Center and at least, in any event, from the hours of 10:00 a.m. to 9:30 p.m. Monday through Saturday, and 12:00 noon to 5:00 p.m. on Sundays, and shall maintain therein a substantial stock of merchandise and a sufficient number of employees for the purpose of selling said merchandise, unless prevented from doing so by strikes, fire, casualties or other causes beyond Tenant's control. In no event, however, will Tenant be open for business after 10:00 p.m. or before 9:00 a.m. on any day without Landlord's consent.

\* \* \*

adjacent Marshall's outlet terminated operations and was replaced by a Staples office supply store.

Tenant further agrees that during the entire term hereof, no part of the Demised Premises shall be abandoned or left vacant unless the Demised Premises have been destroyed by fire or other casualty.

R.R. 17a–18a. The agreement also afforded various remedies to Summit, including liquidated damages, in the event that Shoe Show failed to perform its duties under the lease:

*24. Default by Tenant*

\* \* \*

Landlord, Tenant and Guarantor, if any, covenant and agree, because of the difficulty or impossibility of determining Landlord's damages, should Tenant (i) fail to take possession of and open for business in the Demised Premises in accordance with the terms of this Lease; or (ii) vacate, abandon or desert the Demised Premises; or (iii) cease operating Tenant's business therein (except where the Demised Premises are rendered untenantable by reason of fire, casualty or other causes beyond Tenant's control not resulting from negligent acts or omissions of Tenant or Tenant's employees, agents, contractors, licensees, concessionaires or invitees); or (iv) fail or refuse to maintain the business hours, days or nights or any part thereof as provided in this Lease, then, in any of such events (hereinafter referred to as "failure to do business"), Landlord, at its option, shall have the right:

 (a) to collect not only the fixed annual Minimum Rent and other rentals and charges herein reserved, but also to collect an additional amount equal to the total of: (1) **one hundred fifteen percent (115%)** [of] the greatest amount of any Percentage Rent payable by Tenant in any lease year as provided herein, plus (2) **fifteen percent (15%)** of the fixed annual Minimum Rent herein reserved, plus (3) **fifteen percent (15%)** of all other rentals and charges herein reserved; said additional amount shall be payable for the period of Tenant's failure to do business, computed at a daily rate each and every day during such period, and such additional

amount shall be deemed to be liquidated damages for such period; and/or

(b) to treat such failure to do business as a default.

\* \* \*

The rights and remedies given to Landlord by this Lease shall be deemed to be cumulative and no one of such rights and remedies shall be exclusive at law or in equity of the rights and remedies which Landlord might otherwise have by virtue of a default under this Lease, and the exercise of one such right or remedy by Landlord shall not impair Landlord's standing to exercise any other right or remedy against Tenant or any Guarantor. . . .

R.R. 37a–41a (boldface in original).

Shoe Show began doing business at the Centre as a "Burlington Shoes" in November 1992.[2] By 1994, however, Shoe Show apparently concluded that its store at the Centre was an unsuccessful venture,[3] and therefore began attempting to negotiate with Summit for termination of the lease agreement. In spite of repeated attempts to reach an amicable end to the lease, Summit consistently refused to allow Shoe Show to terminate its operations. Meanwhile, Shoe Show's financial shortfalls from its operations at the Centre began to mount, as it lost $98,280 in fiscal year 1998 and $108,846 in fiscal year 1999. Consequently, on or about January 4, 2000, Shoe Show notified Summit that it intended to vacate the premises, yet simultaneously pledged to continue its payment of the base rent required by the lease agreement.[4] Summit responded that Shoe Show was obligated by the agreement to keep the store open.

2. For reasons not explained in the record, Shoe Show apparently utilized the "Burlington Shoes" name at the Centre in spite of a requirement in the agreement that Shoe Show use the name "Shoe Department." See R.R. 17a.

3. This lack of success is perhaps illustrated by the fact that sales at the Centre location never reached the "breakpoint" figure that Shoe Show was required to reach before Summit was entitled to a percentage of Shoe Show's gross sales at the Centre.

4. In fact, Shoe Show's rent payments were current as of the May 2000 preliminary injunction hearing.

Nevertheless, Shoe Show ceased its operations and vacated the store premises on January 30, 2000. In response, Summit filed both a complaint in equity and a petition for a preliminary injunction in the Erie County Court of Common Pleas on February 17, 2000, seeking an order that Shoe Show reopen its store at the Centre.[5] At the May 2000 preliminary injunction hearing, Summit presented a single witness in support of its contentions that the "use" provision was an essential term of the lease agreement, and that the Centre is an economically interdependent unit that suffers a "domino effect" of harm when a tenant vacates in violation of that provision. Shoe Show responded with a witness of its own in support of its contentions that Summit's claim, at bottom, was for monetary damages and thus could be remedied at law, and that the balance of harms favored Shoe Show because it would have lost a projected $121,906 in fiscal year 2000 and would have been faced with $272,913 in costs to reopen the closed Centre location.

In June 2000, the trial court denied Summit's petition for a preliminary injunction, concluding that Summit had failed to prove immediate and irreparable harm, that Summit had an adequate remedy at law, and that injunctive relief would disproportionately harm Shoe Show. On appeal, the Superior Court reversed and remanded, concluding that the trial court had failed to accord appropriate significance to the "real and immeasurable" harm visited on Summit by Shoe Show in terms of Summit's tenant diversity, credibility, ability to lease units at the Centre, and ability to enforce its current lease agreements. 786 A.2d 240, 245–46 (Pa.Super.2002). We granted Shoe Show's petition for allowance of appeal,[6] 569 Pa.

5. Shoe Show filed a preliminary objection to Summit's complaint, arguing that Summit was not entitled to equitable relief because it had an adequate remedy at law in damages. As the matter proceeded solely on Summit's petition for a preliminary injunction, however, the trial court did not dispose of Shoe Show's preliminary objection. We likewise take no position regarding the underlying equity complaint.

6. Summit moved to dismiss the instant appeal on mootness grounds on February 25, 2003, but we denied that motion on March 3, 2003.

106, 801 A.2d 468 (2002), and now reverse the order of the Superior Court.

Shoe Show contends that the Superior Court committed an error of law because it exceeded the limited standard of review applicable to a trial court's denial of a preliminary injunction. Specifically, Shoe Show argues that the Superior Court was bound to affirm the trial court's order unless it found that the trial court abused its discretion. Such was not the case here, according to Shoe Show, because the trial court properly found that Summit had failed to present any evidence of irreparable harm, and instead presented only speculative and uncorroborated claims. On the other hand, Shoe Show points out that it proved to the trial court that it would have sustained substantial financial harm had an injunction been entered. Thus, Shoe Show avers, the trial court's decision had a reasonable basis and should have been affirmed by the Superior Court. Shoe Show claims that the Superior Court instead conducted what amounted to an improper *de novo* review of the record, and in doing so, erroneously credited the testimony of Summit's witness after the trial court had rejected that testimony as speculative. Shoe Show therefore contends that the Superior Court's order must be reversed. We agree.

 As an initial matter, we restate here that, in general, appellate courts review a trial court order refusing or granting a preliminary injunction for an abuse of discretion. *Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 602 A.2d 1277, 1286–87 (1992); *Bloomingdale's By Mail, Ltd. v. Dep't of Revenue,* 513 Pa. 149, 518 A.2d 1203, 1204 (1986). We have explained that this standard of review is to be applied within the realm of preliminary injunctions as follows:

> [W]e recognize that on an appeal from the grant or denial of a preliminary injunction, we do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below. Only if it is plain that no grounds exist to support the decree or that the rule of law

relied upon was palpably erroneous or misapplied will we interfere with the decision of the [trial court].

*Roberts v. Board of Dirs. of Sch. Dist.*, 462 Pa. 464, 341 A.2d 475, 478 (1975); *see also Giant Eagle Mkts. Co. v. United Food & Commercial Workers Union, Local Union No. 23*, 539 Pa. 411, 652 A.2d 1286, 1291 (1995) (stating "apparently reasonable grounds" standard); *Commonwealth v. Coward*, 489 Pa. 327, 414 A.2d 91, 98 (1980) (same); *Herman v. Dixon*, 393 Pa. 33, 141 A.2d 576, 577 (1958) (same). This Court set out the reasons for this highly deferential standard of review almost a hundred years ago:

> It is somewhat embarrassing to an appellate court to discuss the reasons for or against a preliminary decree, because generally in such an issue we are not in full possession of the case either as to the law or testimony—hence our almost invariable rule is to simply affirm the decree, or if we reverse it to give only a brief outline of our reasons, reserving further discussion until appeal, should there be one, from final judgment or decree in law or equity.

*Hicks v. Am. Natural Gas Co.*, 207 Pa. 570, 57 A. 55, 55–56 (1904). Thus, in general, appellate inquiry is limited to a determination of whether an examination of the record reveals that "any apparently reasonable grounds" support the trial court's disposition of the preliminary injunction request.[7] *See Roberts*, 341 A.2d at 478.

 In ruling on a preliminary injunction request, a trial court has "apparently reasonable grounds" for its denial of relief where it properly finds that any one of the following "essential prerequisites" for a preliminary injunction is not satisfied. *See Maritrans GP*, 602 A.2d at 1282–83 (requirements for preliminary injunction are "essential prerequisites"); *County of Allegheny v. Commonwealth*, 518 Pa. 556, 544 A.2d 1305, 1307 (1988) ("For a preliminary injunction to issue, every one of the[ ] prerequisites must be established; if the petitioner fails to establish any one of them, there is no need to address the others."). First, a party seeking a preliminary

---

7. The standard of review differs where the trial court has granted a mandatory preliminary injunction. *See infra* note 13.

injunction must show that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. *Singzon v. Dep't of Pub. Welfare,* 496 Pa. 8, 436 A.2d 125, 127–28 (1981); *John G. Bryant Co. v. Sling Testing & Repair, Inc.,* 471 Pa. 1, 369 A.2d 1164, 1167–68 (1977); *Ala. Binder & Chem. Corp. v. Pa. Indus. Chem. Corp.,* 410 Pa. 214, 189 A.2d 180, 184 (1963). Second, the party must show that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings. *Maritrans GP,* 602 A.2d at 1283; *Valley Forge Historical Soc'y v. Washington Mem'l Chapel,* 493 Pa. 491, 426 A.2d 1123, 1128–29 (1981); *Ala. Binder & Chem. Corp.,* 189 A.2d at 184. Third, the party must show that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct. *Valley Forge Historical Soc'y,* 426 A.2d at 1128–29; *Herman,* 141 A.2d at 577–78. Fourth, the party seeking an injunction must show that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits. *Anglo–Am. Ins. Co. v. Molin,* 547 Pa. 504, 691 A.2d 929, 933–34 (1997); *Maritrans GP,* 602 A.2d at 1283–84; *Shenango Valley Osteopathic Hosp. v. Dep't of Health,* 499 Pa. 39, 451 A.2d 434, 440 (1982); *Singzon,* 436 A.2d at 127–28. Fifth, the party must show that the injunction it seeks is reasonably suited to abate the offending activity. *John G. Bryant Co.,* 369 A.2d at 1167–71; *Albee Homes, Inc. v. Caddie Homes, Inc.,* 417 Pa. 177, 207 A.2d 768, 771–73 (1965). Sixth and finally, the party seeking an injunction must show that a preliminary injunction will not adversely affect the public interest. *Maritrans GP,* 602 A.2d at 1283; *Philadelphia v. District Council 33, AFSCME,* 528 Pa. 355, 598 A.2d 256, 260–61 (1991).

In the instant case, the trial court found not only that Summit had failed to prove immediate and irreparable harm, but also that Summit had an adequate remedy at law and that

injunctive relief would disproportionately harm Shoe Show. With regard to immediate and irreparable harm, the trial court reasoned that Summit's sole witness, Gregory J. Rubino,[8] had failed to demonstrate that Summit's alleged harm "was anything other than speculative." No. 60004-2000, slip op. at 4 (Com. Pl. Allegheny Sept. 18, 2000). In support of this conclusion, the trial court explained that although Rubino testified generally about the negative affect Shoe Show's absence was having on the Centre's tenant mix, he did not specifically demonstrate how Shoe Show's absence was actually affecting the other "interdependent" stores. *Id.* Additionally, the court pointed out that Summit had failed to present any evidence to corroborate Rubino's "domino effect" theory, such as evidence of decreased tenant retention. *Id.* The court also noted that Summit had not presented any evidence regarding vacancy rates both before and after Shoe Show had departed, which could have been used to establish that Summit was having greater difficulty leasing space in the Centre after Shoe Show's departure. *Id.* at 4–5. Furthermore, the trial court found it noteworthy to Summit's claimed immediate and irreparable harm that the 5,400 square foot space leased to Shoe Show occupied less than one percent of the Centre's 550,000 square feet of space. *Id.* at 5 n. 2.

Next, regarding Summit's possible remedy at law, the trial court pointed out that the lease provided for liquidated damages to compensate Summit in the event that Shoe Show vacated the premises prematurely. *Id.* at 5–6. The trial court found that this "clear indication of a reasonable option" provided Summit with an adequate remedy at law, especially given the speculative nature of the harm sustained. *Id.* Finally, with regard to proportionate harm, the trial court concluded that the balance of harms actually favored Shoe Show, as Summit's speculative harm paled in comparison to Shoe Show's uncontested claim that reopening would result in at least $394,819 in losses and reopening costs. *Id.* at 6–7.

8. Rubino is Vice–President of Baldwin Brothers, Inc., which appears to be Summit's parent company.

■ Viewing the foregoing trial court conclusions through the lens of the applicable standard of review, we hold that an examination of the record reveals that "apparently reasonable grounds" support the trial court's denial of the requested preliminary injunction. With regard to immediate and irreparable harm, the trial court's conclusion finds support in the record because Rubino's testimony rested almost entirely on speculation and hypothesis, as he provided no concrete evidence of harm such as data relating to other stores' lost sales, decreased retention rates, or increased vacancy rates. *See, e.g.,* R.R. 154a–155a (Rubino describes "domino effect" theory in response to question regarding "hypothetical shopping center"); R.R. 155a–156a (Rubino describes economic impact in response to question regarding theoretical "absence of one or two tenants," and offers explanation of economic impact in hypothetical situation "where there's five, six, seven vacancies"); 173a–174a (Rubino admits on cross-examination that records are maintained relating to overall revenue and revenue per tenant; no evidence presented by Summit in this regard); 176a (Rubino admits that "anchor" tenants had not vacated as a result of Shoe Show's departure); *cf. Novak v. Commonwealth,* 514 Pa. 190, 523 A.2d 318, 320 (1987) (rejecting speculative considerations as legally sufficient to support preliminary injunction); *New Castle Orthopedic Assocs. v. Burns,* 481 Pa. 460, 392 A.2d 1383, 1387 (1978) (plurality) (stating that "actual proof of irreparable harm" required for preliminary injunction, and concluding that injunction granted in that case was improper because record failed to indicate irreparable harm); *Credit Alliance Corp. v. Phila. Minit–Man Car Wash Corp.,* 450 Pa. 367, 301 A.2d 816, 818 (1973) (trial court properly denied preliminary injunction where no showing made of necessity to avoid immediate and irreparable harm); *Sameric Corp. of Mkt. St. v. Goss,* 448 Pa. 497, 295 A.2d 277, 279 (1972) (rejecting speculative considerations offered in support of preliminary injunction).

In addition, the trial court's conclusion regarding the adequacy of the remedy at law finds support in the record because Summit failed to substantiate, through business rec-

ords, expert testimony, or otherwise, its claim that damages would not provide an adequate or complete remedy to Summit. *See, e.g.*, 173a–174a (Rubino admits on cross-examination that records are maintained relating to overall revenue and revenue per tenant; no evidence presented by Summit in this regard); *see also* R.R. 177a (Rubino admits that harm to Summit is "[u]ltimately ... lost dollars"); *Reading Co. v. Mehta,* 12 Phila.Co.Rptr. 573, 579–80, 1985 WL 384529 (Com.Pl.Phila.1985) ("[T]here has been no showing of the absence of an adequate legal remedy. This is particularly true in the instant matter where petitioners could have quantified their business losses, if any.... Assuming that good business and legal requirements mandate the keeping of records, petitioners could have used such records to quantify any alleged losses sustained."); *cf. New Castle Orthopedic Associates,* 392 A.2d at 1385–86 (trial court improperly granted injunction because party seeking injunction failed to show injury incapable of remedy by damages); *Credit Alliance Corp.,* 301 A.2d at 818 (trial court properly denied preliminary injunction where party seeking injunction had "full and adequate" remedy at law in suit for damages). Moreover, considering the trial court's apparent skepticism of Summit's claim of harm, it was reasonable for the court to conclude that any harm actually sustained by Summit could be remedied by monetary damages either by way of the liquidated damages clause in the lease agreement, *see supra* at 998–99 (quoting R.R. 37a–41a), or through a suit for damages sounding in breach of contract.[9] *See* No. 60004–2000, slip op. at 6 ("Given the speculative nature of *any* harm, let alone irreparable harm, it is apparent that the contract between the parties

9. Although Summit correctly points out that the lease agreement allows Summit to pursue equitable remedies in·addition to liquidated damages, and also appears to be correct that the lease agreement's "use" provision is a material term, the parties' agreement in this case cannot supplant the legal restriction that a preliminary injunction is not available where damages provide an adequate remedy. Additionally, we refuse to consider Summit's claim that injunctive relief is necessary for it to enforce similar leases, as we cannot speculate regarding future cases that may offer different factual circumstances.

provided Summit with an adequate remedy at law." (emphasis added)).

■ Finally, the trial court's conclusion regarding the balance of harms is supported by the record because Summit did not contest the minimum $394,819 in losses and reopening costs presented by Shoe Show and, as noted above, failed to present the trial court with particular evidence of its own harm to be weighed against Shoe Show's.[10] *Cf. School Dist. v. Wilkinsburg Educ. Ass'n,* 542 Pa. 335, 667 A.2d 5, 7–8 (1995) (dissolving preliminary injunction where record did not establish that issuing preliminary injunction avoided greater harm than refusing it); *Herman,* 141 A.2d at 578 (trial court improperly granted injunction because greater harm would be visited on enjoined party than on party seeking injunction); *Moyerman v. Glanzberg,* 391 Pa. 387, 138 A.2d 681, 684–85 (1958) (trial court properly denied preliminary injunction where greater harm would be visited on enjoined party than on party seeking injunction). Accordingly, as the foregoing factors demonstrate that "apparently reasonable grounds" support the trial court's order,[11] its decision should have been

**10.** Summit contends, and the Superior Court concluded, that it was inappropriate for the trial court to consider Shoe Show's reopening costs because such expenses were caused solely by Shoe Show's "wrongful" departure from the Centre. *See* 786 A.2d at 246 ("any losses sustained by [Shoe Show] to re-open the store would result from their [sic] own desertion"). We, however, reject the notion that the trial court was not permitted to consider Shoe Show's reopening costs, as Summit was notified on or about January 4, 2000 of Shoe Show's imminent departure, yet did not promptly seek an order in equity to prevent its occurrence. Rather, Summit waited until over six weeks had elapsed and Shoe Show had long departed to file its petition for a preliminary injunction on February 17, 2000. Thus, as Summit failed to take swift action in an attempt to prevent Shoe Show's departure, it cannot now complain that the natural consequences of that departure were considered in the trial court's equity calculus. *See, e.g., Barnes & Tucker Co. v. Bird Coal Co.,* 334 Pa. 324, 5 A.2d 146, 150 (1939) ("equity aids the vigilant, not those who slumber upon their rights").

**11.** We note that any one of the trial court's three rationales would have independently supported its denial of the requested preliminary injunction. *See County of Allegheny,* 544 A.2d at 1307 ("if the petitioner fails to establish any one of [the prerequisites for a preliminary injunction], there is no need to address the others"). This principle also explains why it was not necessary for the trial court to address the remaining

affirmed.[12]

 The Superior Court's failure to affirm the trial court order is primarily the result of its erroneous application of the standard of appellate review. *See County of Allegheny*, 544 A.2d at 1308 ("The proponent of a preliminary injunction faces a heavy burden of persuasion especially where, as here, the trial court has not been persuaded and has denied the injunction request."). For example, instead of examining the record for "any apparently reasonable grounds" in support of the trial court's decision, the Superior Court. appears to have undertaken an independent review of the record and decided that Rubino's testimony was entitled to more weight than that which the trial court accorded it. *Compare* 786 A.2d at 245 ("In light of Rubino's testimony, we find that relief is necessary to prevent immediate and irreparable harm to [Summit]."), *with* No. 60004–2000, slip op. at 4–5 (concluding that Rubino's testimony did not sufficiently demonstrate immediate and irreparable harm). Similarly, the Superior Court's rejection of Shoe Show's projected losses reflects an improper application of the standard of review, as the trial court plainly credited Shoe Show's projections. *Compare* 786 A.2d at 246 ("Any [of Shoe Show's] projected losses, in 2000 and beyond, are purely speculative."), *with* No. 60004–2000, slip op. at 6–7 ("The uncontradicted and credible testimony in this case reveals ... that if [Shoe Show] had continued in operation, in the year 2000 it would stand to lose an additional amount of approximately $120,000.00."). Therefore, as the Superior Court's reweighing of the testimony and independent credibili-

requirements for a preliminary injunction. *See supra* at 1001 (delineating requirements for preliminary injunction).

12. We further note that the trial court's decision is in accord with persuasive authority from other jurisdictions concerning injunctions sought by shopping center lessors to compel store proprietors to continue their operations. *See generally, e.g., CBL & Assocs., Inc. v. McCrory Corp.*, 761 F.Supp. 807 (M.D.Ga.1991) (refusing shopping center owner's request for preliminary injunction in part because center owner had adequate remedy at law in damages); *8600 Assocs., Ltd. v. Wearguard Corp.*, 737 F.Supp. 44 (E.D.Mich.1990) (same); *Ciolfi v. Boston Chicken, Inc.*, 7 Mass.L.Rptr. 570, 1997 WL 625450 (Mass.Super.1997) (refusing shopping center owner's request for preliminary injunction in part because center owner had failed to show irreparable harm).

ty findings demonstrate its plain violation of the applicable standard of review, we must set aside the Superior Court's decision.[13] *See Giant Eagle Mkts.*, 652 A.2d at 1293 (Superior Court cannot reweigh testimony taken by trial court in preliminary injunction matter).

In conclusion, there were "apparently reasonable grounds" supporting the trial court's refusal of the preliminary injunction because the record supports the trial court's conclusions that Summit's harm was speculative in nature, that it had an adequate remedy at law, and that Shoe Show would have sustained more harm than Summit had an injunction been entered. Accordingly, the Superior Court erred in reversing the trial court's order denying injunctive relief.

The order of the Superior Court is reversed.

Justice EAKIN did not participate in the consideration or decision of this case.

**13.** In addition to the Superior Court's failure to abide by the applicable standard of review, we are also troubled by the Superior Court's failure to even acknowledge that its reversal of the trial court order was the equivalent of granting a mandatory preliminary injunction, an extraordinary remedy that should be utilized only in the rarest of cases. *See Mazzie v. Commonwealth*, 495 Pa. 128, 432 A.2d 985, 988 (1981) ("This Court has engaged in greater scrutiny of mandatory injunctions and has often stated that they should be issued more sparingly than injunctions that are merely prohibitory.").