J.A05035/14

2015 PA Super 25

| WMI GROUP, INC., WM ROBOTS, LLC, AND WM MANAGEMENT GROUP, INC., | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| Appellants | : | |
| v. | : | |
| CHARLES FOX AND IED DETECTION SYSTEMS, LLC, | : | |
| Appellees | : | No. 1550 EDA 2013 |

Appeal from the Order Entered May 24, 2013
In the Court of Common Pleas of Montgomery County
Civil Division No(s).: 2013-11288

BEFORE: ALLEN, JENKINS, and FITZGERALD,[*] JJ.

OPINION BY FITZGERALD, J.:                    **FILED FEBRUARY 06, 2015**

Appellants, WMI Group, Inc., WM Robots, LLC, and WM Management Group, Inc., appeal from the order entered in the Montgomery County Court of Common Pleas denying their petition for a temporary restraining order and preliminary injunction against Appellees, Charles Fox and IED Detection Systems, LLC.[1] Appellants contend the trial court erred by not issuing a preliminary injunction enjoining Appellees from violating a restrictive covenant. We hold that Appellants have not established their burden that

---

[*] Former Justice specially assigned to the Superior Court.

[1] This is an interlocutory appeal as of right. **See** Pa.R.A.P. 311(a)(4).

the restrictive covenant binds Fox and, regardless, have not demonstrated the existence of a trade secret. Given the preliminary nature of the record and that Appellants' entitlement to injunctive relief is presently unclear, we affirm.[2]

We state the facts as set forth by the trial court:

> [Appellants] are in the business of marketing and selling machine and robotic products, some of which they manufacture, and some of which are manufactured by other companies.
>
> On August 6, 2004, [Fox] entered into an employment agreement with Wolstenholme Machine, Inc. (WMI).[3] Attached to the employment agreement was an employment letter on Wolstenholme Machine stationary which outlined Fox's salary, commission, benefits and

---

[2] Our affirmance is based on the preliminary nature of this record. It is not a holding on the ultimate merits of Appellants' claims, which can be developed more fully prior to trial. As our Supreme Court explained:

> It is somewhat embarrassing to an appellate court to discuss the reasons for or against a preliminary decree, because generally in such an issue we are not in full possession of the case either as to the law or testimony— **hence our almost invariable rule is to simply affirm the decree**, or if we reverse it to give only a brief outline of our reasons, reserving further discussion until appeal, should there be one, from final judgment or decree in law or equity.

**Summit Towne Ctr., Inc. v. Shoe Show of Rocky Mount, Inc.**, 573 Pa. 637, 646, 828 A.2d 995, 1000-01 (2003) (emphasis added and citation omitted).

[3] Although WMI is not one of the named appellants, the parties agree that WMI is now known as WMI Group, Inc. Appellants' Brief at 4; Appellees' Brief at 3.

general employment duties. Both of these documents were signed by Agit Gene Samsi (hereinafter "Samsi") [who was then the] Vice President General Manager and Fox. Section 5 of the 2004 Employment Agreement stated as follows:

> NON-COMPETITION
>
> 5.01 During the term of this Agreement and for 12 months following the termination of Employee's employment, Employee will not, without WMI's prior written consent: (i) accept employment with a competitor or in any other manner compete with those business activities to which the Employee was assigned during the 24 month [sic] prior to his termination of employment with WMI, (ii) solicit any customer or potential customer of WMI that Employee or his subordinates solicited or serviced for WMI or (iii) solicit to leave WMI or hire any individual who was an WMI employee during Employee's employment at WMI.

Trial Ct. Op. at 1-2.

The 2004 Agreement explicitly provided that the non-compete clause was effective upon termination of the Agreement:

> 1.04 This Agreement and all obligations hereunder, except for the post-employment obligation, shall automatically terminate if and when Employee assumes a different position in the Company[4] and signs a new Agreement, or upon termination of employment. The post-employment obligations described in Section 4.0 and 5.0 of the Agreement shall remain in full force and effect after this Agreement is terminated.

---

[4] The 2004 Agreement defined "Company" as Wolstenholme Machine, Inc., *i.e.*, WMI. **See** Appellants' Prelim. Inj. Hr'g Ex. 3-B.

Appellants' Prelim. Inj. Hr'g Ex. 3-B.[5]  The 2004 Agreement was also binding upon any successors and assigns to WMI: "This Agreement . . . shall be binding upon and inure to the benefit of WMI and Employee and their respective successors and permitted assigns and the Company will require its successors to expressly assume its obligations under this Agreement . . . ."  *Id.*

We continue to quote the trial court's recitation of the facts:

> Fox's initial employment duties were to acquire new customers and sell products manufactured by [Appellants] in their machine shop.
>
> On January 10, 2007, Fox signed a document on WM Robots, LLC stationary titled "Promotion to new Position within Company."  The employer listed is A. Gene Samsi with WM Management Group, LLC.[6]  This document described Fox's new position as WM Robots' Sales and Business Development Manager and set forth his salary and commissions.  The document did not contain a non-compete provision and did not refer to the non-compete provision in the 2004 agreement [with WMI].

Trial Ct. Op. at 2 (citation omitted).

---

[5] The certified record did not include the preliminary injunction hearing exhibits.  Our Supreme Court held "that where the accuracy of a pertinent document is undisputed, the Court could consider that document if it was in the Reproduced Record, even though it was not in the record that had been transmitted to the Court."  Pa.R.A.P. 1921 note (citing ***Commonwealth v. Brown***, 617 Pa. 107, 117 n.4, 52 A.3d 1139, 1145 n.4 (2012)).  In this case, because the preliminary hearing exhibits are part of the reproduced record and neither party has disputed their accuracy, we will consider them.  ***See id.***

[6] WM Management Group, **LLC** is not a named party.  WM Management Group, **Inc.**, however, is a party.

J. A05035/14

We reproduce the 2007 document, as follows:

**<u>Promotion to new Position within Company</u>**

Employee: [Fox]

Employer: A. Gene Samsi with WM Management Group, LLC

Date: 1/10/2007

Effective Date: 1/1/2007

This letter is to formalize and define the agreement to Promote . . . Fox to the position of WM Robots' Sales and Business Development Manager.

Responsibilities include, but not limited to, Sales, Sales Management, Customer Service & Business Development for WM Robots' products.

The defined territory for these responsibilities is global with the exception of UVSS products with territories reserved by BDL Systems Limited (England).

Products included, but not limited to, Robots (Currently [sic] the KNIGHT) and accessories, Wolstenholme AeroMed's HazProbe, BDL Systems' UVSS, and any other WM Robots' product defined as any product or system sold as a WM Management Group's part number.

Salary is $70,000 per year with annual reviews in the month of December.

Commissions on all WM Robot products will be 1% of Gross Sales with the exception of the KNIGHT product line, which will be .5% of Gross Sales. All new sales (sales orders received after January 1st, 2007) are subject to this commission structure. In addition to commissions received for WM Robots' products, certain projects currently running or pending in WMI and CST are subject to a commission of .25% through 2007. These projects are listed below . . . .

Appellants' Prelim. Inj. Hr'g Ex. 4. As noted above, WM Robots, LLC, is a

different entity than WMI/WMI Group, Inc., in the 2004 agreement.

> Fox's new position replaced two individuals who left the company, and included new responsibilities of working on WM Robots' robotic under-vehicle surveillance and [robotic camera]-type equipment. Fox stopped selling WMI products and solely worked on WM Robots' product lines in his new position.
>
> Later in 2007, WM Robots, LLC contracted with Vallon, a German manufacturer of metal detection systems, magnetometers and degaussing equipment to represent and sell their products in the United States. Fox was assigned by Samsi as the sole salesperson for Vallon products. In this new position, Fox established a relationship with Vallon and the U.S. Military, the largest customer of WM Robots' Vallon products. Thereafter, 90 percent of Fox's sales were devoted to selling Vallon products. The annual sales from WM Robots to the U.S. Military was approximately $60 million in 2011 and $110 million in 2012.
>
> On April 6, 2011, Fox signed a document on WM Robots stationary titled "Promotion and Commission Agreement Update for Charles Fox." This document identified Fox's new title as Vice President of Business Development and described his commissions. This document was signed by Samsi and Fox, and did not contain a non-compete provision. Again, no reference was made to the non-compete provision in the 2004 agreement between Fox and WMI.

Trial Ct. Op. at 2-3.

We set forth the 2011 document:

> PROMOTION & COMMISSION AGREEMENT UPDATE FOR CHARLES FOX
>
> Effective immediately, Charles Fox has been promoted to the new position of Vice President of Business

Development. The following commission rates apply and are valid indefinitely:

All Vallon products: 3% of Gross Sales

All existing WM Robots' products: 1% of Gross Sales

New WM Robots' products: To be negotiated on a case by case basis.

HazProbe: 1% of Gross Sales

Wolstenholme Machine Shop Sales related to WM Robots' customers: 1% of Gross Sales

Commission is due upon payment from customer in [sic] payable in soonest pay cycle.

Appellants' Prelim. Inj. Hr'g Ex. 8. WM Robots, LLC—a different entity than WMI Group, Inc.—is the company listed in the signature blocks of the agreement. *Id.*

In late October 2012, Samsi and Bob Wolstenholme, owner of the three companies, presented Fox with a new Employment Agreement[,] which included a non-compete provision. Fox believed he was not bound by a non-compete provision since there was no such provision in the April 6, 2011 Employment Agreement. Fox would not agree to Wolstenholme's proposed non-compete restriction. After failed negotiations, Fox submitted a letter of resignation on March 29, 2013, wherein he stated "it is my intention to begin a new venture which will involve my representation of Vallon GmbH and Cobham Technological Services." Fox intended to actively compete with [Appellants] for Vallon's business. On April 2, 2013, Samsi received an email from Dan Dukes, a program manager for WM Robots, which was anonymously forwarded to him by one of his government contacts who had received the email from Fox. The email states, in relevant part:

If I have assumed correctly, you should have received an email from Gene Samsi about my resignation from WM Robots. I am creating my own company and still will be representing VALLON. I will also be representing Cobham Technical Services, who manufactures the ground penetrating radar portion of the VALLON detectors.

I am not sure what role WM Robots will have with Vallon in the future, but I promise there will be no service interruptions. This departure from WM Robots was not a rushed decision. My company will allow you more flexibility in dealing with VALLON, including direct contracts if so desired.

On May 10, 2013, Jürgen Braunstein, sales director for Vallon, emailed Samsi and Fox and stated:

We informed you in an earlier phase that we want to go ahead with Clay [*i.e.*, Charles Fox], preferably within WM Robots.

This is still our preference. However, Clay has his own company now.

The legal situation remains to be cleared, also for the staff that WM Robots is hiring. As long as the legal situation is not clear, we do not want to lose any business opportunities. Therefore we encourage WM Robots and IED Detection Systems to win customers for our products. We do not want any confusion for the customers and that both parties behave fair. Do not do any competition in front of the customer. If one party has a new business opportunity then the other party should respect it and should not try to squeeze in.

On May 13, 2013, [Appellants] filed a Complaint against Fox and his new company, IED Detection Systems, LLC,

alleging breach of contract, misappropriation,[7] conversion of trade secrets, tortious interference, unfair competition, conversion, and breach of duty of loyalty. [Appellants] concurrently filed a Petition for Temporary Restraining Order and for Preliminary Injunction. An evidentiary hearing before the undersigned was held on May 22, 2013, and an order denying the Petition for Temporary Restraining Order and for Preliminary Injunction was entered on May 24, 2013. A Notice of Appeal to the Superior Court was filed by [Appellants] on the same day.

Trial Ct. Op. at 3-4 (footnote omitted). Appellants timely filed a court-ordered Pa.R.A.P. 1925(b) statement. Appellants also filed an application for an injunction pending appeal pursuant to Pa.R.A.P. 1732(b), which this Court denied on August 19, 2013.[8]

Appellants raise the following issues:

Whether [Appellees] should have been temporarily and preliminarily restrained from using [Appellants'] trade secrets and confidential information to unfairly compete with [Appellants] by stealing (and/or attempting to steal) [Appellants'] primary supplier and customers, in violation of the restrictive covenants in Fox's 2004 employment agreement and in violation of [PUTSA]?

Whether Fox's employment agreement was valid and enforceable at the time of [his] resignation, where the employment agreement was never terminated or superseded by a subsequent agreement during the course of [his] employment?

---

[7] This claim is based upon a violation of the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa.C.S. §§ 5301-5308, which "displaces conflicting tort, restitutionary and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret." 12 Pa.C.S. § 5308.

[8] Appellants did not file anything under seal with the trial court or this Court.

> Whether [Appellants'] network of customer contacts, customer-related information, marketing relationships within the niche (bomb detection device) market, and pricing methodology constitute trade secrets under the PUTSA, where such information is integral to [Appellants'] competitive advantage, required the expenditure of significant resources to develop, and is not readily ascertainable by [Appellants'] competitors?
>
> Whether Fox's solicitation of [Appellants'] primary supplier and customers while possessing and using [Appellants'] confidential information and trade secrets, in violation of the restrictive covenants in Fox's 2004 employment agreement, constitutes irreparable harm under Pennsylvania law?

Appellants' Brief at 2-3 (reordered to facilitate disposition).

We summarize Appellants' arguments for their first two issues.[9]

Appellants generally allege the trial court was obligated to issue a preliminary injunction against Appellees. Appellants suggest that a prior 2004 agreement with WMI, which included a non-compete clause, was not replaced by the 2007 and 2011 agreements with WM Robots, LLC, each of

---

[9] Despite raising four issues in their brief, Appellants divide their argument into only three parts, thus violating Pa.R.A.P. 2119(a), which mandates that "argument shall be divided into as many parts as there are questions to be argued." **See** Pa.R.A.P. 2119(a). We decline to quash, however. **See PHH Mortg. Corp. v. Powell**, 100 A.3d 611, 615 (Pa. Super. 2014) (declining to quash appeal despite numerous violations of appellate briefing rules); **see also Commonwealth v. Briggs**, 608 Pa. 430, 516, 12 A.3d 291, 343 (2011) ("The briefing requirements scrupulously delineated in our appellate rules are not mere trifling matters of stylistic preference; rather, they represent a studied determination by our Court and its rules committee of the most efficacious manner by which appellate review may be conducted so that a litigant's right to judicial review as guaranteed by Article V, Section 9 of our Commonwealth's Constitution may be properly exercised.").

which lacked a non-compete clause. *Id.* at 17. Appellants reason that Fox's promotion within WM Robots, LLC, did not void the prior agreement with WMI. *Id.* Instead, Appellants opine that the trial court should have disregarded the plain language of the 2007 and 2011 agreements with WM Robots, LLC, and considered the parties' intent. *Id.* That intent, Appellants insist, was to incorporate the original 2004 agreement with WMI by implicit reference. *Id.* To substantiate their unstated intent, Appellants rely upon parol evidence. *Id.* at 19-21. Appellants alternatively suggest that the 2004 agreement with WMI coexists with the 2007 and 2011 agreements with WM Robots, LLC. *Id.* at 17-18 (citing, *inter alia*, Restatement (First) of Contracts § 408 (1932)).[10] We hold Appellants are not entitled to relief.

In *Synthes USA Sales, LLC v. Harrison*, 83 A.3d 242 (Pa. Super. 2013), our Court discussed the applicable standard of review and legal principles for resolving an appeal from a request for a preliminary injunction:

> Our scope of review is plenary.
>
> > Our review of a trial court's order granting or denying preliminary injunctive relief is highly deferential. This highly deferential standard of review states that in reviewing the grant or

---

[10] Appellants cite only one Pennsylvania state case, *Robert Grace Contracting Co. v. Norfolk & W. Ry. Co.*, 259 Pa. 241, 102 A. 956 (1918), which predates Section 408. Appellants also cite several Pennsylvania federal cases, which are not binding on this Court. *See* Appellants' Brief at 17-18. Generally, "federal court decisions do not control the determinations of the Superior Court." *NASDAQ OMX PHLX, Inc. v. PennMont Secs.*, 52 A.3d 296, 303 (Pa. Super. 2012) (citations omitted).

denial of a preliminary injunction, an appellate court is directed to examine the record to determine if there were any apparently reasonable grounds for the action of the court below.

An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused. We do not inquire into the merits of the controversy. ***Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the trial court.***

A trial court has apparently reasonable grounds for granting the extraordinary remedy of preliminary injunctive relief if it properly finds that all of the essential prerequisites are satisfied.

There are six essential prerequisites that a party must establish prior to obtaining preliminary injunctive relief. The party must show: 1) "that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages"; 2) "that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings"; 3) "that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct"; 4) "that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits"; 5) "that the injunction it seeks is reasonably suited to abate the offending activity"; and, 6) "that a preliminary injunction will not adversely affect

the public interest." The burden is on the party who requested preliminary injunctive relief.

A decision addressing a request for a preliminary injunction thus requires extensive fact-finding by the trial court because the moving party must establish it is likely to prevail on the merits. If the moving party's right to relief is unclear, then a preliminary injunction should not issue.

**Synthes**, 83 A.3d at 248-50 (emphasis added and punctuation, footnote, and citations omitted). Upon fulfilling all the "essential prerequisites," the movant may obtain injunctive relief narrowly tailored to protect the employer's legitimate business interest. **Three Cnty. Servs., Inc. v. Phila. Inquirer**, 337 Pa. Super. 241, 246, 486 A.2d 997, 1000 (1985) (noting "the preliminary injunction, if issued, should be no broader than is necessary for the petitioner's interim protection").

To establish a clear right to relief on a claim for breach of restrictive covenants of an employment contract, a party must, *inter alia*, demonstrate the following:

In Pennsylvania, restrictive covenants are enforceable if they are incident to an employment relationship between the parties; the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent. Our law permits equitable enforcement of employee covenants not to compete only so far as reasonably necessary for the protection of the employer. However, restrictive covenants are not favored in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living.

Pennsylvania cases have recognized that trade secrets of an employer, customer goodwill and specialized training and skills acquired from the employer are all legitimate interests protectable through a general restrictive covenant. In essence, the court must examine and balance the employer's legitimate business interest, the individual's right to work, the public's right to unrestrained competition, and the right to contract in determining whether to enforce a restrictive covenant.

In construing a restrictive covenant, courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone. It is not the function of this Court to re-write it, or to give it a construction in conflict with the accepted and plain meaning of the language used.

> Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

*Synthes*, 83 A.3d at 250-51 (punctuation and citations omitted).

Furthermore, with respect to restrictive covenants:

Courts have consistently held that the taking of employment is sufficient consideration for a covenant not to compete. *Capital Bakers v. Townsend*, 426 Pa. 188, 190, 231 A.2d 292, 293 (1967). An employee's promotion to a new position *within the company* also constitutes

sufficient consideration. ***Jacobson & Co. v. International Environment Corp.***, 427 Pa. 439, 449, 235 A.2d 612, 618 (1967). However, the covenant must be executed contemporaneously with the exchange of consideration. ***Capital Bakers***[,] 426 Pa. at 190–91, 231 A.2d at 293–94. In ***Capital Bakers***, a salesman executed a restrictive covenant when he was hired. He later executed a supplementary covenant without any change in his employment status. Our Supreme Court refused to enforce the second covenant because it was not executed contemporaneously with the exchange of consideration. The Court allowed enforcement of the original covenant. ***Id.***

***Records Ctr., Inc. v. Comprehensive Mgmt., Inc.***, 363 Pa. Super. 79, 84-85, 525 A.2d 433, 435-36 (1987) (emphasis added).

Strong public policy considerations underlie the conclusion that restrictive covenants are not assignable. Given that restrictive covenants have been held to impose a restraint on an employee's right to earn a livelihood, they should be construed narrowly; and, absent an explicit assignability provision, courts should be hesitant to read one into the contract. Moreover, the employer, as drafter of the employment contract, is already in the best position to include an assignment clause within the terms of the employment contract. Similarly, a successor employer is free to negotiate new employment contracts with the employees . . . or secure the employee's consent to have the prior employment contract remain in effect.

***Hess v. Gebhard & Co.***, 570 Pa. 148, 164-65, 808 A.2d 912, 921 (2002) (punctuation and citation omitted).

Instantly, as set forth above, Appellants asked the trial court to disregard the 2007 and 2011 agreements with WM Robots, LLC, and hold that the 2004 agreement with WMI controlled. When Fox terminated employment with WMI and joined WM Robots, LLC, in 2007, Fox did not

assume a different position within WMI. *See* Appellants' Prelim. Inj. Hr'g Ex. 3-B; *cf. Records Ctr.*, 363 Pa. Super. at 84-85, 525 A.2d at 435-36. Accordingly, the non-compete clause provision—set forth within the 2004 agreement with WMI—became effective for twelve months. *See* Appellants' Prelim. Inj. Hr'g Ex. 3-B; *Hess*, 570 Pa. at 164-65, 808 A.2d at 921 (mandating narrow, stringent construction of restrictive covenants). Similarly, absent an applicable, explicit assignment clause, we decline to impute the non-compete clause to WM Robots, LLC. *See Hess*, 570 Pa. at 164-65, 808 A.2d at 921.

Appellants have also asked this Court to rely upon parol evidence to establish the parties' intent to incorporate by reference the 2004 agreement's non-compete clause. But Appellants have not referred this Court to any ambiguous language such that we may resort to extrinsic and parol evidence. *See Synthes*, 83 A.3d at 248-51. Appellants have not identified any contract language "reasonably susceptible of different constructions and capable of being understood in more than one sense." *See id.* Our courts are barred from considering Appellants' parol evidence absent the predicate condition of ambiguity. *See id.*

As noted above, Appellants alternatively relied on, *inter alia*, Restatement (First) of Contracts § 408 in support of their proposition that the 2004 agreement with WMI coexists with the 2007 and 2011 agreements with WM Robots, LLC. Section 408 states as follows:

> § 408 Discharge of Duty Under an Earlier Contract by a Subsequent Inconsistent Contract
>
> A contract containing a term inconsistent with a term of an earlier contract **between the same parties** is interpreted as including an agreement to **rescind** the inconsistent term in the **earlier** contract. The parties may or may not at the same time agree to rescind all the other provisions of the earlier contract. Whether they do this is a question of interpretation, except as this rule is qualified by the rule stated in § 223.[11]

Restatement (First) of Contracts § 408 (emphases added). Section 408 self-evidently addresses rescission of an inconsistent term—*i.e.*, a non-compete clause—in a prior contract between the same parties. ***Id.***; ***Wathen v. Brown***, 200 Pa. Super. 620, 624, 189 A.2d 900, 903 (1963) (holding, "Parties to a contract may rescind it by making a new contract inconsistent therewith." (citing Restatement (First) of Contracts § 408)); ***see also In re Klugh's Estate***, 362 Pa. 166, 173, 66 A.2d 822, 825 (1949) ("The rule is well settled that the ***parties to a contract*** may rescind it by making a new contract inconsistent therewith." (emphasis added and citations omitted)).

Instantly, Appellants' argument presumes the parties are identical for both the earlier and subsequent contracts. WMI was a party to the 2004 agreement; WM Robots, LLC was not a party. **See** Appellants' Prelim. Inj. Hr'g Ex. 3-B. WM Robots, LLC—not WMI—was a party to the 2007 and 2011 agreements. **See** Appellants' Prelim. Inj. Hr'g Ex. 4, Ex. 8. Absent identical

---

[11] Restatement (First) of Contracts § 223 (1932) addresses the effect of the statute of frauds.

parties for the contracts at issue, § 408 is inapplicable and rescission cannot occur. ***See Wathen***, 200 Pa. Super. at 624, 189 A.2d at 903; Restatement (First) of Contracts § 408; ***see also In re Klugh's Estate***, 362 Pa. at 173, 66 A.2d at 825. For these reasons, Appellants are not entitled to relief.

For their third issue, Appellants contend their pricing method is a trade secret. Appellants opine they price their products based upon negotiating discounts with their customers, profit margins, and "currency hedging," *i.e.*, "hedging against the fluctuation in the exchange rate between the U.S. Dollar and the Euro." Appellants' Brief at 28.[12] They claim this "compilation of information" is a trade secret because the "mixture of those ingredients" is "unknown outside" of Appellants. ***Id.*** at 29. The trial court erred, Appellants suggest, by focusing on the individual ingredients—*i.e.*, the discounts, profit margins, and "currency hedging"—and not on the combination of those individual ingredients. ***Id.*** Appellants separately contend their network of customer contacts, information, and relationships are also trade secrets. We hold Appellants are due no relief.

At the preliminary injunction hearing, Appellants testified about their currency hedging:

> [Samsi[13]]: WM Robots buys these products from Vallon, and we pay for them in euros. The exchange rate

---

[12] Appellants did not define "currency hedging" in any of their pleadings.

[13] Samsi is the chief operating officer of WMI.

fluctuation that is prevalent in the euro is absorbed by WM Robots. So in order to maintain a certain level of margin of profit, we do what is called currency hedging. And we determine an exchange rate for a—let's say there is a quotation or an estimate being supplied by the Government. *I* determine what the exchange rate should be so that we cover the period that that particular contractor delivery order is going to be open.

N.T. Prelim. Inj. Hr'g, 5/22/13, at 53 (emphasis added).

The trial court requested clarification from Samsi:

The court: . . . One of the things I think you mentioned about was that [Fox] has unique knowledge as to the currency exchange during a transaction.

[Samsi]: Yes.

The court: Why would that be so unique? Why wouldn't any person who is sophisticated in international currency understand the same logistics that you're saying he has?

[Samsi]: Your Honor, it is unique to the extent of how we use the exchange rate fluctuation and how we hedge against fluctuations and how we price our products; that is unique to WM Robots.

The court: How so? In other words, wouldn't that be the same for anybody who buys and sells internationally?

[Samsi]: In some form, *yes*. They would be able to be [sic] do that, *yes*.

The court: With respect to the pricing schedule, from what I understood . . . , if someone were to make a Freedom of Information Request—would they actually see the actual contract?

[Samsi]: They can see the contract, yes, Your Honor.

*Id.* at 101 (emphases added and capitalization omitted).

During the cross-examination of Fox, the court elicited an example of currency hedging:

> [Appellants' counsel]. Part of the way [Appellants] made a profit was to figure out how to correctly hit the right number of the conversion rate from euros to dollars?
>
> [Fox]. Yes.
>
> Q. And you were aware of how . . . WMI, did that?
>
> A. I was tracking the exchange rate myself. The present communication that [Samsi] would have with the accountants, dealing with the exchange rates was not . . . presented to me.
>
> The court: Can you give me an example? Let's use [100 euros] as to how fluctuation in the exchange rate would affect the price, the setting of the price, let's say a unit costs [100 euros].
>
> [A.] We would get a 20% discount. So the WM Robots' cost for that product would then be 80 euros. We would take the 100 euro price and look at the exchange rates. If the exchange rate—around now, it is about 1.3. So we would then take the 1.3 exchange rate and multiply that by the euro cost. And we would put out a price of $130. And if there were additional discounts, then that would be done separately. That would be based on whatever Samsi would allow.
>
> The court: Let me follow this again. Let's say the price from Vallon is 100 euros. There is a discount of 20 percent, so now it is 80 [euros]. But you're setting it at a 1.3 exchange rate, at 130 euros. Does that mean the Government would pay 130 euros for the unit?
>
> [A.] . . . They would pay $130.
>
> The court: Oh, $130. What about the discount? Is that just profit?
>
> [A.] Yes.

[Appellants' counsel]: So as you just explained, you were aware of how the pricing worked, right?

A. Yes. But I was not aware of the actual exchange rates that Mr. Samsi was getting.

The court: Would he get a different rate than anyone trading in international currency would get?

[A.] No.

The court: So I don't understand your comment that you weren't aware of the rates he was getting. Would [Samsi] get a unique rate?

[A.] Mr. Samsi was the only one that was dealing with the accountants to hedge the dollar to the euro. I was not— that was not a part of my role or responsibility.

*Id.* at 146-48 (capitalization omitted); *see also id.* at 53.

Fox confirmed that he did not hedge currency on redirect examination:

[Appellees' counsel: Y]ou mentioned something called in the pricing . . . a "hedging of the rates." I am a little unclear on what that means. In the circumstances of pricing, when you're calculating the conversion rate from the euro to the dollar, what does it mean to hedge that rate?

[Fox]. The . . . existing currency conversion rate is only in real time. These [sales] contracts [for products] would take place or be delivered several months down the road. So to properly anticipate what the exchange rate would be at the time of delivery or payment from the Government in order to make the WM Robots' payment to Vallon, you would enter into hedging contracts to limit your exposure to wildly fluctuating exchange rates.

Q. Who made these hedging decisions?

A. [Samsi] did.

- 21 -

Q. Do you have any experience in international markets that make you qualified to make hedging decisions?

A. No.

*Id.* at 186-87. Thus, both Fox and Samsi testified that only Samsi engaged in currency hedging.[14] *Id.*; *accord id.* at 53, 148. Samsi also testified that customer information, contracts, and prices are publicly available. *Id.* at 91-94, 101 (agreeing prices publicly available via Freedom of Information Request).

To obtain injunctive relief, a party must establish that the information at issue is a "trade secret," as that term is defined by PUTSA. 12 Pa.C.S. § 5302; *Iron Age Corp. v. Dvorak*, 880 A.2d 657, 664 (Pa. Super. 2005) (affirming denial of preliminary injunction because movant failed to establish information at issue qualified as trade secret). The PUTSA defines "trade secret" as follows:

> "Trade secret." Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

---

[14] We note the common occurrence of currency hedging contracts. *See, e.g.*, *Union Steel Mfg. Co. v. United States*, 837 F. Supp. 2d. 1307, 1321 (Ct. Int'l Trade 2012) (noting "currency hedging" involves currency swap contracts); *In re Sadia, S.A. Secs. Litig.*, 643 F. Supp. 2d 521, 523 (S.D.N.Y. 2009) (same).

          (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa.C.S. § 5302. "[I]f a competitor could obtain the information by legitimate means, it will not be given injunctive protection as a trade secret." ***Shepherd v. Pittsburgh Glass Works, LLC***, 25 A.3d 1233, 1245 (Pa. Super. 2011) (citation omitted).

Instantly, even assuming the existence of a valid non-compete agreement, Appellants never raised an argument before the trial court that it was the unique combination or ***compilation of information*** that formed the basis of the trade secret at issue. Given Appellants' emphasis on the currency hedging alone, we do not fault the trial court for not anticipating Appellants' unvoiced compilation-of-information argument. Accordingly, because they failed to raise the argument that the ***compilation*** or combination of the instant discounts, profit margins, and currency hedging is a trade secret, ***see*** 12 Pa.C.S. § 5302, Appellants have waived it on appeal. ***See*** Pa.R.A.P. 302 ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Regardless, currency hedging is common knowledge and Fox did not engage in such hedging. N.T. at 53 (Samsi testifying, "I determine" exchange rate), 146-48, 186-87. Samsi also testified Appellants' customer information, contracts, and prices were publicly available. ***Id.*** at 91-94, 101. Thus, because such information

can be obtained via legitimate means, injunctive relief is presently unavailable.[15] *See Shepherd*, 25 A.3d at 1245.

Appellants lastly claim the trial court failed to ascertain whether Appellees' use of Appellants' alleged trade secrets constitutes irreparable harm. Appellants' last issue presumes the existence of trade secrets and thus derives from their third issue. Because we discern no abuse of discretion with the trial court's resolution of Appellants' third issue, we need not address it. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/6/2015

---

[15] As noted above, our standard of review for preliminary injunctive relief is highly deferential. *See Summit Towne Ctr.*, 573 Pa. at 646, 828 A.2d at 1000-01 (stating default position of appellate court is to affirm trial court's order resolving request for preliminary injunctive relief); *Synthes*, 83 A.3d at 248 (same). Appellants have an opportunity to develop the record further at trial.