J. A25035/15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| SOFTMART COMMERCIAL SERVICES INC. : | IN THE SUPERIOR COURT OF |
| : | PENNSYLVANIA |
| v. : | |
| : | |
| JACQUELYN MARIANI AND : | |
| ARRAYA SOLUTIONS, INC., : | |
| : | |
| Appellant : | No. 461 EDA 2015 |

Appeal from the Order January 13, 2015
In the Court of Common Pleas of Chester County
Civil Division No(s).: 2014-07615-CT

BEFORE: DONOHUE, MUNDY, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:             **FILED NOVEMBER 04, 2015**

Appellant, Jacquelyn Mariani, appeals from the order entered in the Chester County Court of Common Pleas that granted the petition of Appellee, Softmart Commercial Services, Inc.,[1] for a preliminary injunction. Appellant contends the court misconstrued the restrictive covenant and the record did not justify injunctive relief. We affirm.[2]

---

[*] Former Justice specially assigned to the Superior Court.

[1] Arraya Solutions, Inc. ("Arraya"), is not a party to this appeal.

[2] As this Court recently observed:

> Our affirmance is based on the preliminary nature of this record. It is not a holding on the ultimate merits of [the] claims, which can be developed more fully prior to trial. . . .
>
> It is somewhat embarrassing to an appellate court to discuss the reasons for or against a

We adopt the facts as set forth by the trial court's opinion.[3] **See** Trial Ct. Op., 4/21/15, at 1-4. Appellant timely appealed and timely filed a court-ordered Pa.R.A.P. 1925(b) statement.[4]

Appellant raises the following six issues:

> 1. Did the Trial Court err by concluding that the Restrictive Covenant Agreement ("RCA") is enforceable when it was not ancillary to an employment contract; when it was not supported by adequate consideration; when it was not reasonably limited in time and geographic territory; and when it was not necessary to protect a legitimate business interest of Softmart Commercial Services, Inc. ("Appellee") without imposing an undue hardship on Appellant?

---

> preliminary decree, because generally in such an issue we are not in full possession of the case either as to the law or testimony—**hence our almost invariable rule is to simply affirm the decree**, or if we reverse it to give only a brief outline of our reasons, reserving further discussion until appeal, should there be one, from final judgment or decree in law or equity.

**WMI Grp., Inc. v. Fox**, 109 A.3d 740, 743 n.2 (Pa. Super. 2015) (citation omitted).

[3] Appellee did not raise a claim under the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa.C.S. §§ 5301-5308. **See also** 12 Pa.C.S. § 5308 cmt.

[4] Appellee also moved for counsel fees and costs, averring fourteen timekeepers, over 1,300 billable hours, and a noteworthy almost half-million dollars in fees were required to obtain preliminary injunctive relief. **See** Appellant's Answer to Appellee's Pet. for Att'ys' Fees and Costs, 1/30/15; **cf.** American Intellectual Property Law Association, Report of the Economic Survey 36 (2013) (listing median fees for trade secret misappropriation suit).

2. Did the Trial Court err by concluding that Appellee would likely succeed on the merits of its claims against Appellant for breach of the RCA when there was no evidence of harm (e.g., lost customers, lost partners, lost revenues, or any other identifiable harm) to Appellee which is an essential element of any cause of action for breach of contract?

3. Did the Trial Court err by giving the RCA as expansive a reading as possible instead of a more narrow reading against Appellee, especially when any competition between Appellant's new employer, Arraya Solutions, Inc. ("Arraya"), and Appellee was limited at most because no witness could point to a single instance in which Arraya and Appellee competed for a client or a project and not one witness could point to a single customer that Appellee lost as a result of Appellant's employment with Arraya?

4. Did the Trial Court err by concluding that Appellant's employment at Arraya was unlawful or wrongful conduct under the RCA when there was no evidence that she utilized or was in physical possession of any confidential or proprietary information of Appellee after she made all of her phones and computers available to Appellee's forensic consultant, who found no wiping utilities used, no confidential information taken, no documents printed or downloaded, no spoliation of evidence, no theft of trade secrets, and no transfer of any information to any third parties?

5. Did the Trial Court err by concluding that a preliminary injunction would restore the *status quo* existing prior to Appellant's departure from Appellee when the preliminary injunction restricting her from working in eastern Pennsylvania did not restore the *status quo* but disrupted the *status quo*, which had her working for seven months in Delaware and Chester counties for Arraya without any harm to Appellee?

6. Did the Trial Court err by concluding that the harm to Appellee outweighed the harm to Appellant if a preliminary injunction were not issued when Appellant was forced out of her local region into a smaller commission market with significantly reduced income and new obstacles for travel

and business development, especially where the evidence suggested an abuse by Appellee of its superior bargaining power and a callous disregard for Appellant's interest in pursuing her chosen occupation, neither of which serves the public interest?

Appellant's Brief at 7-9.

We summarize Appellant's arguments in support of her first four issues. In support of her first issue, Appellant claims the RCA is not enforceable for four reasons. First, Appellant asserts that when she accepted the job offer, no one mentioned a non-compete agreement. Second, she contends she did not receive adequate consideration for the RCA, as she signed it five years after starting her job. Third, Appellant argues that the geographic restriction was unclear.[5] Lastly, she insists the RCA was unnecessary to protect Appellee's business interest given the existence of a non-solicitation clause.

Regarding her second issue, Appellant reasons Appellee failed to establish harm and thus could not recover for its breach of contract claim. For her third issue, Appellant maintains the court erred by holding Arraya and Appellee are competitors. With respect to Appellant's fourth issue, she maintains that she never used or possessed any of Appellee's trade secrets. She insists that Appellee adduced no evidence that she possessed any

---

[5] Appellee, however, counters that Appellant is restricted from contacting customers within her assigned regions of eastern Pennsylvania and Georgia. *See* Appellee's Brief at 29; N.T. Prelim. Inj. Hr'g, 1/9/15, at 121-22.

confidential information on any of her phones and computers. For these four issues, we hold Appellant is due no relief.

Our scope and standard of review was recently set forth as follows:

Our scope of review is plenary.

Our review of a trial court's order granting or denying preliminary injunctive relief is highly deferential. This highly deferential standard of review states that in reviewing the grant or denial of a preliminary injunction, an appellate court is directed to examine the record to determine if there were any apparently reasonable grounds for the action of the court below. . . .

We do not inquire into the merits of the controversy. **Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the trial court.**

A trial court has apparently reasonable grounds for granting the extraordinary remedy of preliminary injunctive relief if it properly finds that all of the essential prerequisites are satisfied.

There are six essential prerequisites that a party must establish prior to obtaining preliminary injunctive relief. The party must show: 1) "that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages"; 2) "that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings"; 3) "that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct"; 4) "that the activity it seeks to restrain is actionable, that its

right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits"; 5) "that the injunction it seeks is reasonably suited to abate the offending activity"; and, 6) "that a preliminary injunction will not adversely affect the public interest." The burden is on the party who requested preliminary injunctive relief.

A decision addressing a request for a preliminary injunction thus requires extensive fact-finding by the trial court because the moving party must establish it is likely to prevail on the merits. If the moving party's right to relief is unclear, then a preliminary injunction should not issue. . . .

To establish a clear right to relief on a claim for breach of restrictive covenants of an employment contract, a party must, *inter alia*, demonstrate the following:

> In Pennsylvania, restrictive covenants are enforceable if they are incident to an employment relationship between the parties; the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent. Our law permits equitable enforcement of employee covenants not to compete only so far as reasonably necessary for the protection of the employer. However, restrictive covenants are not favored in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living.

Pennsylvania cases have recognized that trade secrets of an employer, customer goodwill and specialized training and skills acquired from the employer are all legitimate interests protectable through a general restrictive covenant. In essence, the court must examine and balance the employer's legitimate business interest, the individual's right to work, the public's right to unrestrained

competition, and the right to contract in determining whether to enforce a restrictive covenant.

In construing a restrictive covenant, courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone. It is not the function of this Court to re-write it, or to give it a construction in conflict with the accepted and plain meaning of the language used.

> Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court. . . .

Furthermore, with respect to restrictive covenants:

> Courts have consistently held that the taking of employment is sufficient consideration for a covenant not to compete. An employee's promotion to a new position **within the company** also constitutes sufficient consideration.

**Fox**, 109 A.3d at 747-49 (citations omitted).

As noted above, a restrictive covenant protects an employer's trade secrets. For a non-PUTSA[6] claim,

> [t]he very concept of a "trade secret" is itself "somewhat nebulous." Therefore, the decision of whether a particular compilation of customer data deserves protection as a trade secret necessarily must be made on a case-by-case basis. Our law is well settled that, to be classified as a trade secret, information must be an employer's actual secret and not comprise mere "general trade practices." Furthermore, the information must be of peculiar importance to the employer's business before the law will protect it as a trade secret.

***Iron Age Corp. v. Dvorak***, 880 A.2d 657, 664 (Pa. Super. 2005) (citations omitted).

> [O]ur Supreme Court has held that, under certain circumstances, customer lists and customer data may be entitled to protection as trade secrets. Furthermore, a trade secret may include compiled information which gives one business an opportunity to obtain an advantage over

---

[6] Appellee elected not to raise a claim under PUTSA, which defines "trade secret" as follows:

> "Trade secret." Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa.C.S. § 5302.

> competitors. Nevertheless, customer lists are at the very periphery of the law of unfair competition. There is no legal incentive to protect the compilation of such lists because they are developed in the normal course of business anyway.

*Id.* at 663 (citations and quotation marks omitted). Even if such a list is not entitled to protection as a trade secret, "the law will also prevent an employe[e] from using customer contacts as well as confidential customer information to his own advantage by soliciting the customers of his former employer." ***Morgan's Home Equipment Corp. v. Martucci***, 136 A.2d 838, 843 (Pa. 1957) (footnote omitted).

After careful review of the parties' briefs, the record, and the reasoned decision of the Honorable Edward Griffith, we affirm Appellant's first four issues based on the trial court's decision. ***See*** Trial Ct. Op. at 5-14 (holding (1) RCA executed in connection with Appellant's promotion within company; (2) Appellant's promotion resulted in increased compensation; (3) RCA limited to eastern Pennsylvania and Georgia; (4) record substantiates multiple solicitations such that enforcement of RCA reasonably necessary to protect Appellee; and (5) grounds exist supporting determination of harm to Appellee and that Appellee is competitor to Arraya).[7] We need not resolve whether the identity of Appellee's customers is a trade secret, ***see Dvorak***,

---

[7] As noted above, Appellee maintains Appellant's regions are limited to eastern Pennsylvania and Georgia. ***See*** Appellee's Brief at 29; N.T. Prelim. Inj. Hr'g, 1/9/15, at 121-22.

880 A.2d at 663, as Appellant admitted to soliciting those customers, which both the RCA and the law forbids. *See Martucci*, 136 A.2d at 843; *see also In re Strahsmeier*, 54 A.3d 359, 364 n.17 (Pa. Super. 2012) ("As an appellate court, we may uphold a decision of the trial court if there is any proper basis for the result reached; thus we are not constrained to affirm on the grounds relied upon by the trial court." (citation omitted)).

For her fifth issue, we reproduce the entirety of Appellant's argument below:

> The preliminary injunction did not restore the *status quo* existing prior to Appellant's departure from Appellee because Appellant had been working in Delaware and Chester counties for Arraya without any harm to Appellee for over seven months. To the contrary, the preliminary injunction restricting her from working in these counties could not restore the *status quo* but only disrupt it.

Appellant's Brief at 36. Appellant is not due any relief.

As a prefatory matter, Appellant's one-paragraph argument is devoid of any legal analysis. *Id.* Appellant has not explained how or why the trial court erred. "It is the appellant who has the burden of establishing his entitlement to relief by showing that the ruling of the trial court is erroneous under the evidence or the law. Where the appellant has failed to cite any authority in support of a contention, the claim is waived." *Bunt v. Pension Mortg. Assocs., Inc.*, 666 A.2d 1091, 1095 (Pa. Super. 1995) (citations omitted); *accord Korn v. Epstein*, 727 A.2d 1130, 1135 (Pa. Super. 1999).

Because Appellant has cited no legal authority, she has waived this claim on appeal. *See Bunt*, 666 A.2d at 1095.

Regardless, we would have discerned no trial court error. As our Supreme Court explained, the "status quo to be maintained by a preliminary injunction is the last actual, peaceable and lawful noncontested status which preceded the pending controversy." *Valley Forge Historical Soc'y v. Washington Mem'l Chapel*, 426 A.2d 1123, 1129 (Pa. 1981) (citation omitted). As the trial court observed, the status quo is prior to Appellant's unlawful actions. *See id.* Accordingly, we would not have granted Appellant relief.

Appellant lastly argues that the harm from the preliminary injunction outweighed the harm to Appellee from not granting a preliminary injunction:

> Appellant was forced out of her local region of Chester and Delaware Counties into a smaller commission market with significantly reduced income and new obstacles for travel and business development. By contrast, Appellee's claims of greater injury are merely speculative harms about its reputation and the potential loss of goodwill and future business. These harms pale in comparison to the harm Appellant faces. Thus, by granting the preliminary injunction, the Trial Court rewarded the abuse by Appellee of its superior bargaining power and its callous disregard for Appellant's interest in pursuing her chosen occupation despite suffering no identifiable harm, neither of which served the public interest.

Appellant's Brief at 36-37 (citations omitted). As with Appellant's fifth issue, her bald allegations are not supported by legal analysis and thus she has waived them on appeal. *See Bunt*, 666 A.2d at 1095.

In any event, in **Ogontz Controls Co. v. Pirkle**, 499 A.2d 593 (Pa. Super. 1985), this Court addressed whether "the lower court incorrectly found that greater harm would be done by refusing the preliminary injunction than by granting it." **Id.** at 597. In resolving this issue, the **Pirkle** Court referenced

> cases in which a former employer alleges that his former employee has violated an anti-competition provision of an employment contract. In those cases, the defendant can often claim great harm, because a preliminary injunction puts him out of business or out of a job. However, preliminary injunctions have been approved in those situations due to the very nature of the agreed upon restriction, to prevent the **way** in which the former employee goes about making his or her livelihood after leaving the former employer.

**Id.** (citations omitted).

Instantly, Appellant noted she would be inconvenienced and earn less income if she complied with the injunction—less impactful than having no business or no job. **Cf. id.** While we do not minimize the gravity of the harm to Appellant, we discern no basis—particularly given this preliminary record, **cf. Fox**, 109 A.3d at 743 n.2—to conclude the trial court abused its discretion by improperly weighing the harms attendant to a preliminary injunction. Accordingly, after careful consideration of the record, grounds

exist for the trial court's ruling and thus we discern no abuse of discretion.[8]

*See id.* at 748.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>11/4/2015</u>

---

[8] It bears repeating that "our standard of review for preliminary injunctive relief is highly deferential" and thus, Appellant has "an opportunity to develop the record further at trial." *See Fox*, 109 A.3d at 753 n.2.

SOFTMART COMMERCIAL SERVICES, INC.

     Plaintiff

    v.

JACQUELYN MARIANI and ARRAYA SOLUTIONS, INC.

     Defendants

: IN THE COURT OF COMMON PLEAS

: CHESTER COUNTY, PENNSYLVANIA

: NO. 2014-07615

: CIVIL ACTION – LAW

*Attorneys for Plaintiff: James T. Smith, Esq., William R. Cruse, Esq., Lauren M. Fitzgerald, Esq., Thomas A. Riley, Jr., Esq., Jane Richardson, Esq.*
*Attorneys for Defendants: Garth G. Hoyt, Esq., Dianne G. Moretzsohn, Esq.*

## OPINION

Defendant, Jacquelyn Mariani ("Mariani"), has appealed from the Order entered January 13, 2015 granting Plaintiff, Softmart Commercial Services, Inc. ("Softmart"), preliminary injunctive relief and enforcing the terms of a restrictive covenant entered when she was employed by Softmart.

*Procedural and Factual Background:*

Softmart commenced this action against its former employee on August 6, 2014 for breach of two agreements, the Employee Innovation and Non-Disclosure Agreement and the Confidentiality, Non-Solicitation and Restrictive Covenant Agreement ("Restrictive Covenant Agreement"). At the same time, Softmart petitioned for preliminary injunctive relief to enforce the terms of the Restrictive Covenant Agreement. On October 31, 2014, Softmart filed an amended complaint and added Arraya Solutions, Inc. ("Arraya"), Mariani's current employer, as a defendant. Following discovery, a hearing was held over five days beginning January 6, 2015. On January 13, 2015, we entered an Order granting Softmart preliminary relief, which required Mariani to comply with the terms of the Restrictive Covenant Agreement.

Mariani was hired by Softmart in April, 2008 as a small business account manager and was responsible for increasing sales to Softmart's small business customers. On July 1, 2011, Mariani was promoted to the position of inside account manager for the south region where she had responsibility for Softmart's accounts in Georgia, working remotely from Pennsylvania. On March 1, 2013, Mariani was promoted to the position of strategic account manager in the eastern region of

Pennsylvania. In this position, she was the face of Softmart and responsible for prospecting new business, while maintaining a presence with Softmart's existing account base. In connection with this promotion, Mariani entered into the disputed Restrictive Covenant Agreement.

Mariani was solicited by Arraya for employment on May 12, 2014 and she accepted a sales position on May 23, 2014. Later on May 23, 2014, Mariani resigned from Softmart. Mariani started working for Arraya on May 29, 2014.

The provisions of the Restrictive Covenant Agreement that Softmart seeks to enforce are:

NO CONTACT WITH OR SOLICITATION OF SUPPLIERS, CUSTOMER REFERRAL SOURCES, AND CUSTOMERS:

I agree that, during my employment and for a period of fifteen (15) months after my employment with Softmart terminates for any reason, voluntary or involuntary, I will not solicit, contact, or provide services to (or attempt to do any of the foregoing,) directly or indirectly, for the purpose or effect of competing or interfering with any part of Softmart's Business: (1) any Customer of Softmart within my Region; (2) any Customer of Softmart that I contacted, solicited, or in any way dealt with at any time during the last two years of my employment; (3) any prospective Customer of Softmart that I contact, solicit or in any way supported or dealt with at any time during the last two years of my employment; or (4) any existing or prospective Customer of Softmart for whom I had any direct or indirect responsibility at any time during the last two years of my employment. For purposes of this Agreement, 'Customer' shall include, without limitation, any company, person or entity that Softmart provides services to, including its director, officers, executive, managers, and representatives. For purposes of this Agreement, my 'Region' shall mean any geographic area to which I have been assigned with the last two years of my employment with Softmart, or, if I was not assigned to a specific geographic area, my 'Region' shall mean the United States of America.

. . .

NO COMPETITION IN SAME REGION:

I agree that, during my employment and for a period of eighteen (18) months after my employment with Softmart terminates for any reason, voluntary or involuntary, I will not, directly or indirectly, compete with Softmart's Business in my Region, as defined above. With respect to the restricted Region, this means that I will not be involved in the Business on my own behalf or on behalf of any Competitor of Softmart in a managerial, marketing, sales, administrative, test lead or other test capacity, whether as an owner, principal, partner, employee, consultant, contractor, agent or

2

representative. 'Competition', as used in the Agreement, shall mean any persons or entities who now, or in the future, develop, provide, offer or intend to offer or provide services in the Business described above.

(Restrictive Covenant Agreement, pp. 4, 5)

Softmart described its business as:

...reselling of computer software, hardware, peripherals, accessories, supplies and other products used in connection with the operation and maintenance of computers, and provides consultation, license management, and training services related to the products described above, and also the quantitative analysis services know[n] as Analytics and SAM engagement, as well as software licensing and management (SLMS).

(Restrictive Covenant Agreement, p. 1)

CONFIDENTIALITY:

I understand that Softmart's proprietary and confidential information includes (without limitation): (1) customer lists or data, customer contact information, customer referral lists or data, customer referral sources, and customer preferences or records; (2) pricing information and policies, billing information and policies, business methods and philosophies of delivering services, business plans and analyses, contractual arrangements, marketing and sales strategies; (3) physical security systems, access control systems, network and other equipment designs; (4) information about products, proposed products, services, developments, processes, procedures, technical information, know-how, expertise, drawings, designs, specifications, scripts; (5) employment and payroll records; (6) tax information, forecasts, budgets, projections and other non-public financial information; (7) expansion plans, management policies and other business strategies and policies; (8) office procedures and protocols; and (9) Analytics" spreadsheets and/or work product. In exchange for my being provided access to such information, I agree that, at all time during and after my employment with Softmart, I will not disclose or communicate any of this information to any competitor or other third party, or use or refer to any of this information for any purpose, including but not limited to in the course of future employment for myself or any entity other than Softmart, or remove materials concerning any of this information from Softmart's premises, except as necessary for me to properly perform services for Softmart during my employment. Upon termination of my employment, I will immediately return to Softmart all correspondence files, business card files, customer and supplier source lists and files, software, manuals, forecasts, budget notes, electronically stored information or data, and other materials that contain any of this information, and I will not retain any copies of the materials. I understand that these provisions apply even to information of this type that is developed or conceived by me, alone or with others, at

3

Softmart's instruction or otherwise. I also understand that these provisions apply to all information I may receive that is confidential and/or propriety to any customer, supplier, or other person or entity who does business with Softmart.

(Restrictive Covenant Agreement, pp. 2-3)

*Discussion*:

To obtain preliminary injunctive relief, Softmart must establish six prerequisites:

> 1) that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages;
>
> 2) that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings;
>
> 3) that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct;
>
> 4) that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits;
>
> 5) that the injunction it seeks is reasonably suited to abate the offending activity; and,
>
> 6) that a preliminary injunction will not adversely affect the public interest.

Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc., 828 A.2d 995, 1001 (Pa. 2003).

We first consider whether Softmart has produced sufficient evidence to establish a clear right to relief on a claim for breach of restrictive covenants of an employment contract. Synthes v. Harrison, 83 A.3d 242 (Pa.Super.2013). To do so, Softmart must show that:

> 1) the restrictive covenant is incident to an employment relationship between the parties;
>
> 2) the restrictive covenant is supported by adequate consideration;
>
> 3) the restrictive covenant is reasonably necessary to protect the legitimate interests of the employer; and,
>
> 4) the restrictive covenant is reasonable in time and geographic scope.

4

Hess v. Gebhard & Co., 570 Pa. 148, 808 A.2d 912, 917 (2002); Kistler v. O'Brien, 464 Pa. 475, 347 A.2d 311 (1975); Capital Bakers, Inc. v. Townsend, 426 Pa. 188, 231 A.2d 292 (1967).

*Incident to the employment relationship*

A restrictive covenant entered into as part of a change in a position of employment is incident to the employment relationship. Jacobson & Co. v. International Environment Corp., 427 Pa. 439, 235 A.2d 612, 618-619 (1967). On February 19, 2013, John Henkels, Mariani's supervisor at Softmart, delivered a letter to Mariani containing an "internal transfer promotional offer" to the position of "Strategic Account Manager-Easter[n] Pennsylvania, Northern Region" to commence March 1, 2013. At the same time, Henkels handed Mariani related documents, including the Restrictive Covenant Agreement. Mariani accepted the offer by signing the letter the same day. However, she took the Restrictive Covenant Agreement for further review. (N.T. Vol. 1, 68:22-69:9, 81:19-82:11; Exh. P-60)

Mariani reviewed the Restrictive Covenant Agreement with an attorney, requested changes, which were refused, and signed the document on March 1, 2013, the same day she commenced her new position. (N.T. Vol. 2, 206:5-214:14, Vol. 3, 134:9-135:12; Exh. P-60)

The preamble of the Restrictive Covenant Agreement recites that Mariani entered the same "in consideration of the commencement of my employment as a "Strategic Account Manager-Eastern PA". (Exh. P-60) Although Mariani cannot clearly recall when she received the Restrictive Covenant Agreement and she contends that it was delivered to her by Susan O'Neill, Softmart's director of Human Relations, and not by Henkels, Mariani nonetheless acknowledged that signing the Restrictive Covenant Agreement was a condition of her acceptance of the Strategic Account Manager position. (N.T. Vol. 2, 204:17-205:5, 205:6-206:4, 214:10-14, Vol. 3, 136:12-20)

In Kistler v. O'Brien, *supra*, cited by Mariani, a restrictive covenant was not enforced because, in part, the requirement of a restrictive covenant was not a term agreed upon when employment was accepted. In fact, O'Brien commenced employment before the requirement of a restrictive covenant was even raised. In our case, there is no dispute that the execution of the Restrictive Covenant Agreement was

5

necessary if Mariani wished to commence employment as a Strategic Account Manager.[1] We therefore concluded that the Restrictive Covenant Agreement was incident to the employment relationship between Softmart and Mariani.

*Supported by adequate consideration*

A beneficial change in employment status is adequate consideration for enforcement of a restrictive covenant. Davis & Warde, Inc. v. Tripodi, 420 Pa.Super. 450, 616 A.2d 1384 (1992). Mariani contends that despite language in Softmart's offer letter, identifying her transfer to Strategic Account Manager as an "internal transfer promotional offer", the new position was simply a transfer, not a promotion.

Mariani's promotion to Strategic Account Manager came with an increase in her guaranteed monthly draw from $4,583 to $6,667 for twelve months, set against a commission rate of 12% of her gross profit margin on sales. At the end of twelve months, Mariani would continue to receive 12% of her gross profit margin and a refundable draw for an additional year. (N.T. Vol. 1, 65:19-66:23, 76:3-18; Exh. P-60) Mariani also received the benefit of an expansion in the geographic region for which she could obtain a bonus, an established customer base and a change in job duties allowing her to be more self-directed. (N.T. Vol. 1, 70:9-71:12)

Mariani contends that she did not receive a raise in pay with her new position. To support her claim, she averaged her monthly pay before the job change and determined that she was paid $6,022 per month based upon her commissions. (Exh. D-104) Therefore, her guaranteed pay increase amounted to only an additional $645 per month. In her new position, Mariani first exceeded her guaranteed draw in October, 2013 and by March, 2014 she was consistently exceeding her guaranteed draw each month. (Exh. D-104) Over the sixteen months that Mariani was employed as a Strategic Account Manager, she earned on average $7,144. (Exh. D-104) Comparing averages instead of draws, Mariani's pay increased by $1,122 per month.

It is evident that despite Mariani's contention, she did receive an enhanced compensation package when she accepted the Strategic Account Manager position. Furthermore, because more of her pay was structured as a guaranteed draw, Softmart

---

[1] Contrary to Mariani's assertion, there is no evidence that her position as an inside account manager was at risk if she refused to sign the Restrictive Covenant Agreement.

6

took the risk of her performance. Mariani's transfer was a promotion to a position where she had greater income potential, more responsibility and greater autonomy. As such, she enjoyed a beneficial change in her employment status which served as adequate consideration for the restrictive covenant.

*Reasonably necessary to protect Softmart's legitimate business interests*

An employer may use a restrictive covenant to protect its business interests, including its trade secrets (e.g., pricing), confidential information, customer goodwill, and business opportunities. Hess, 808 A.2d at 920. Employers have protectable interests in customer relationships that have been acquired through the efforts of its sales representatives.

> In almost all commercial enterprises . . . contact with customers or clientele is a particularly sensitive aspect of the business. . . . In most businesses . . . as the size of the operation increases, selling and servicing activities must be at least in part decentralized and entrusted to employees whose financial interest in the business is limited to their compensation. The employer's sole or major contact with buyers is through these agents and the success or failure of the firm depends in part on their effectiveness. . . . (t)he possibility is present that the customer will regard, or come to regard, the attributes of the employee as more important in his business dealings than any special qualities of the product or service of the employer, especially if the product is not greatly differentiated from others which are available. Thus, some customers may be persuaded, or even be very willing, to abandon the employer should the employee move to a competing organization or leave to set up a business of his own. . . The employer's point of view is that the company's clientele is an asset of value which has been acquired by virtue of effort and expenditures over a period of time, and which should be protected as a form of property. Certainly, the argument goes, the employee should have no equity in the customer which the business had developed before he was employed. Similarly, under traditional agency concepts, any new business or improvement in customer relations attributable to him during his employment is for the sole benefit of the principal. This is what he is being paid to do. When he leaves the company he should no more be permitted to try to divert to his own benefit the product of his employment than to abscond with the company's cashbox.

John G. Bryant Co., Inc. v. Sling Testing & Repair, Inc., 471 Pa. 1, 369 A.2d 1164, 1167–1168 (1977)(citation omitted). Restrictive covenants may not be used to limit competition. Omicron Sys. Inc. v. Weiner, 860 A.2d 554, 560 (Pa.Super.2004).

7

Mariani acknowledged, when she signed the Restrictive Covenant Agreement, that Softmart is in "a highly competitive industry" and that she would be given access to and would be required "to maintain, supervise, develop and initiate client relationships, referral sources and goodwill that are valuable to Softmart and which it has a legitimate interest in protecting." (N.T. Vol. 3, 45:18-21, 46:7-9, 133:8-10; Restrictive Covenant Agreement, pp. 1 at (3), 2 at (7)) The Restrictive Covenant Agreement addresses the protection of these customer relationships by providing for "no contact with or solicitation of suppliers, customer referral source and customers" and "no competition in the same region" for fifteen months and eighteen months, respectively, after her employment with Softmart ended. (Restrictive Covenant Agreement, pp. 4, 5) Absent the agreement, Mariani would be free to sell to Softmart's customers, trading on the relationships she established while a Softmart employee, immediately after leaving Softmart's employ. The Restrictive Covenant Agreement was reasonably necessary for the protection of these customer relationships.

In addition, Mariani was given access to Softmart's customer information, including customer names and contacts, customer purchases by product, date and price, customer preferences, profit information, contract terms, contract expiration dates and license renewal timing, to perform her job. Mariani acknowledged that such information was proprietary and confidential and promised, when she signed the Restrictive Covenant Agreement, that she would "not disclose or communicate any of this information to any competitor or other third party, or use or refer to any of this information for any purpose, including but not limited to in the course of future employment for myself." (Agreement, p. 3) Although there are times when Softmart has shared limited amounts of this information with its partners[2] and customers, protecting this information from competitors is a legitimate concern of Softmart. The Restrictive Covenant Agreement was reasonably necessary for the protection of this proprietary and confidential information.

---

[2] When shared with partners, the use of such confidential information was controlled by the partnership agreement. (Exh. P-8)

8

*Reasonable in time and geographic location*

Mariani bears the burden proving that the temporal and geographic restrictions set forth in the Restrictive Covenant Agreement are unreasonable. <u>Bryant</u>, 369 A.2d at 1169. Mariani argues that an eighteen month prohibition on competition is excessive, particularly when the broad geographic scope of the covenant is considered.

An eighteen month prohibition is not per se unreasonable as Pennsylvania courts have routinely enforced restrictive covenants longer than eighteen months. <u>Hayes v. Altman</u>, 424 Pa. 23, 225 A.2d 670, 673 (1967)(3 years), <u>Worldwide Auditing Services, Inc. v. Richter</u>, 402 Pa.Super. 584, 587 A.2d 772, 776 (1991)(2 years), <u>Boyce v. Smith-Edwards-Dunlap Co.</u>, 398 Pa.Super. 345, 580 A.2d 1382 (1990)(2 years). At Arraya, Mariani is restricted for eighteen months based on the employment agreement she signed there. (N.T. Vol. 2, 219:19-220:9; Exh. P-9)  Mariani only claimed that the duration was too long because eighteen months is a long time for her to be precluded from working for whomever and wherever she chooses. (N.T. Vol. 2, 218:10-20) When dealing with sales employees, time limitations on restrictive covenants are set to permit an employer sufficient time to train, deploy and establish a new sales representative to manage its customers. <u>Hillard v. Medtronic, Inc.</u>, 910 F.Supp. 173, 179 (M.D.Pa.,1995); <u>Bryant</u>, 369 A.2d at 1170. Mariani failed to address this issue and argued instead that the eighteen month prohibition is inconvenient for her.

As to geographic scope, the Restrictive Covenant Agreement is limited to Mariani's region.  Region is defined as "any geographic area to which I have been assigned within the last two years of my employment with Softmart, or, if I was not assigned to a specific geographic area, my 'Region' shall mean the United States of America."  (Restrictive Covenant Agreement, p. 4)  Mariani was assigned to the "Easter[n] Pennsylvania, Northern Region"[3] when she accepted her promotion to Strategic Account Manager. (Vol. 3, 6:17-7:11; Exh. P-60) The Eastern Pennsylvania – Northern Region is that section of Pennsylvania defined by drawing a line from the western boundary of Chester County straight to the New York border, bordered to the

---

[3] The offer letter Mariani signed stated, "…this letter will confirm your acceptance of the position of Strategic Account Manager – Easter[n] Pennsylvania, Northern Region." (Exh. P-60)

9

north by New York, to the east by New Jersey and to the south by Delaware. (N.T. Vol. 1, 160:2-161:1) Prior to commencing work as Strategic Account Manager, Mariani was assigned Georgia as an Inside Account Manager. Therefore, by geography, Mariani was barred from Softmart accounts and prospects in the Eastern Pennsylvania – Northern Region and Georgia, a restriction that Mariani agreed was fair. (N.T. Vol. 3, 7:15-8:5; Vol. 4, 122:17-21)

The language in the Restrictive Covenant Agreement defining "region" is clear and unambiguous. The language in the offer letter assigning Mariani a region is clear and unambiguous. No one disputes the geographic boundaries of the "Eastern Pennsylvania, Northern Region." Mariani maintains that "region" is vaguely described or ambiguous because she is barred from contact with some customers outside of Georgia and Eastern Pennsylvania. However, this bar is separate and apart from her regional bar. To understand why Mariani is barred from customers outside of Georgia and Eastern Pennsylvania, the specific terms of the non-solicitation paragraph must be reviewed. Mariani agreed, when she signed the Restrictive Covenant Agreement, that she would not:

> solicit, contact, or provide services to …
> (1) any Customer of Softmart within my Region;
> (2) any Customer of Softmart that I contacted, solicited, or in any way dealt with at any time during the last two years of my employment;
> (3) any prospective Customer of Softmart that I contacted, solicited, or in any way supported or dealt with at any time during the last two years of my employment; or
> (4) any existing or prospective Customer of Softmart for whom I had any direct or indirect responsibility at any time during the last two years of my employment.

(Restrictive Covenant Agreement, p. 4) Therefore, under paragraphs (2) – (4), Mariani is barred from contact with her former customers and prospects in areas outside of her region. However, contrary to Mariani's contention, her region is not expanded to include all areas in which her former customers and prospects are located.[4]

_____

[4] Mariani acknowledged that there were procedures in place at Softmart if she wanted to work with customers outside of her assigned region, which further confirms that Mariani's region was clearly defined and known to her. (N.T. Vol. 3, 8:6-12:5, 172:7-24)

10

The evidence supports a conclusion that the restrictions on time and geography in the Restrictive Covenant Agreement are reasonable. However, before we can conclude that Softmart has produced sufficient evidence to establish a clear right to relief, we must consider Mariani's conduct after leaving Softmart as well as defenses Mariani has raised.

*Mariani's conduct*

Mariani created a list of her current customers and prospects that she carried to her second interview with Arraya to discuss her employment. (Exh. P-25) The list identified twenty-five customers and five prospects by name and location (city and state only). Christian Gingras, Director of Sales at Arraya, had requested the list for an interview that he set up with Mariani and Daniel Lifshutz, Arraya's CEO and co-owner. (N.T. Vol. 3, 23:9-24:1) Although Mariani denies having used Softmart's resources to create the list, we do not find her credible on this point. Nonetheless, even if she created the list from memory, the information was protected under the Restrictive Covenant Agreement as confidential information. (Restrictive Covenant Agreement, p. 2) While Mariani argues that she provided nothing more than data that is available in a phone directory, such information in a phone directory is not identified as "customers" and "prospects" of Softmart.

After leaving Softmart, Mariani immediately began to work for Arraya in her former region. (N.T. Vol. 4, 138:10-17). With the belief that the only restriction limiting her conduct was that she could do nothing that would hurt Softmart, Mariani began to contact her former Softmart accounts to let them know that she had changed employment. (N.T. Vol. 3, 28:20-29:5, 49:10-14, 77:20-79:9, Vol. 4, 138:18-24) Very quickly, what Mariani contends were innocent, informational contacts, became solicitations for work on behalf of Arraya.

Chaning Bete was Mariani's customer at Softmart. On June 5, 2014, Mariani was in contact with Roger Bailey at Chaning Bete on behalf of Arraya by email and stated, "If you need any Cisco, EMC, VMware, Microsoft Services, managed services (remote helpdesk, cloud back up or DR, Infrastructure management), you know where to find me". (Exh. P-83) Mariani conceded that this was a solicitation. (N.T. Vol. 3, 82:19-20, 83:18-22) As a result of this contact, another employee of Chaning Bete, Deepu

11

Javaramu began a dialogue with Mariani about business they could do together. Mariani agreed that this was the desired outcome of her contact. (N.T. Vol. 3, 82:23-83:10) Mariani professes to have encouraged Chaning Bete to continue to work with Softmart, but her all of her emails with Bailey promote Arraya and encourage Bailey to rely on her for help. (N.T. Vol. 3, 146:1-9; Exhs. D-78, D-79)

HSC was Mariani's customer at Softmart. On June 9, 2014, Mariani was in contact with Glen Sides at HSC to invite him to an Arraya hosted suite at a Phillies game. Mariani conceded that the purpose of inviting him to the game was to build rapport and tell him about Arraya. (N.T. Vol. 3, 90:1-5, 90:14-16; 92:2-20; Exh. P-67) To the extent that HSC was not interested in the VMware being demonstrated at the Phillies event, Mariani encouraged Sides to come out because other people from Arraya would be on hand to provide "insight and education around what might work for HSC." (N.T. Vol. 3, p. 93:14-15) Mariani claims that out of respect for the close relationship she had with Sides, she was compelled to let him know that she had left Softmart. However, in the email that she communicates that she has left, Mariani promotes Arraya and encourages Sides to rely on her for help. (N.T. Vol. 3, 150:21-151:7; Exh. D-87)

Chatham Financial was Mariani's customer at Softmart. (N.T. Vol.3, 95:17-19) On July 14, 2014, Mariani was in contact with Steve Olshevski and Patrick Miller at Chatham Financial by email and introduced Arraya as "a technology planning, design, and implementation partner that focuses on enterprise solutions from EMC, Cisco, VMware and Microsoft services." (Exh. P-90) Mariani admitted that the content of this email amounted to a solicitation. (N.T. Vol. 3, 98:20-22) Within the email, Mariani continued a discussion about work that she had begun while still with Softmart. In other words, Mariani was trading on confidential client information obtained from Softmart while she was selling Chatham Financial Arraya's services directly, whereas earlier she had been trying to bring Arraya in as Softmart's partner. Softmart would have received a fee if Arraya had been brought in as a partner. (N.T. 98:24-99:17; Exh. P-90) Mariani admitted that her conduct interfered with Softmart's partner business. (N.T. 101:8-9)

Untra was Mariani's customer at Softmart. (N.T. Vol. 3, 103:16-19) On June 10, 2014, David Grunwald at Untra was invited as Arraya's guest to a Phillies game at

Mariani's request. (Exh. P-112) VMware Horizon Suite 6 was to be demonstrated at the game. When Grunwald could not attend the game, Mariani followed up with an email offering a meeting, along with her VMware lead, to discuss the VMware product. Although Mariani would only concede that she was offering services that Softmart could not provide directly, the fact remains that she would have been selling the same services a month earlier as a Softmart representative and Softmart would have been paid a fee for bringing in a partner to do the work. (N.T. Vol. 3, 106:14-107:13, 108:14-109:22; Exh. P-112)

Entercom was Mariani's customer at Softmart. On June 3, 2014, Mariani was in contact with John Graefe and Craig Canter at Entercom to invite them to a Phillies game as Arraya's guests. As part of the event, VMware and EMC products would be demonstrated. (N.T. Vol. 3, 109:24-111:2) Mariani conceded that she had invited a total of ten Softmart customers to events, such as a Phillies game, on behalf of Arraya. (N.T. Vol. 3, 105:1-10) The purpose of these events was to educate customers about Arraya and build rapport.

Vertex was Mariani's customer at Softmart. Vertex also had an ongoing business relationship with Arraya and Mariani was assigned the Vertex account by Arraya. In June, 2014 Mariani sent a fruit basket to Vertex to announce her new position with Arraya. (N.T. Vol. 3, 167:15-168:23) In August or September, 2014 Mariani processed a license renewal for Vertex that had historically been renewed with Arraya. (N.T. Vol. 3, 164:12-165:12) In late September, 2014, a million dollar deal was struck by Vertex and Arraya. Mariani had little to do with this deal, which was well along when she was hired by Arraya. (N.T. Vol. 3, 113:21-114:7, 163:22-164:11, Vol. 4, 15:19-21) Mariani was paid 7.5% commission on the deal as compensation for the license renewal. (N.T. Vol. 3, 115:16-18, 165:9-12) Mariani admitted that Softmart was competitive in the marketplace for some of the products included in the deal. (N.T. Vol. 3, 111:9-115:18)

Despite her professed intent to do no harm to Softmart, Mariani immediately began to work her Softmart accounts to transfer customer loyalty to Arraya. Mariani tries to explain away her conduct. However, it is evident that Mariani meddled in Softmart's established customer relationships to gain leverage for Arraya. Mariani

13

sympathized with her customers about the difficulties they were encountering as Softmart transitioned a new sales representative into her old position. She mined the relationships she had built looking for chinks that would allow her to bring in Arraya. She stayed present with her customers. She encouraged her customers to rely on her for help. Mariani used every opportunity to put the products and competencies of Arraya in front of her Softmart customers. Not once did Mariani tell her Softmart customers that she was barred from contact due to the terms of her Restrictive Covenant Agreement. In the single instance where she mentioned the bar, she continued to promote Arraya in the same email. During our hearing, Mariani explained repeatedly that her conduct was friendly, innocent and meant to be helpful to Softmart or at least to do no harm. Unrestrained, Mariani would continue sell Arraya to her former clients and prospects and in her former regions making use of her knowledge of customer needs gained from her employment as a Softmart sales representative.

*Competing business*

Mariani claims that she cannot be in breach of the Restrictive Covenant Agreement because Softmart and Arraya are not competing businesses.

The Restrictive Covenant Agreement defines a "Competitor" of Softmart as "any persons or entities who now, or in the future, develop, provide, offer or intend to offer or provide services in the Business described above." (Restrictive Covenant Agreement, p. 5) Softmart defines its business in the Restrictive Covenant Agreement as the *"reselling of computer software, hardware*, peripherals, accessories, supplies and other products used in connection with the operation and maintenance of computers, *and provides consultation, license management, and training services related to the products described above*, and also the quantitative analysis services know[n] as Analytics and SAM engagement, *as well as software licensing and management (SLMS)"*. (Restrictive Covenant Agreement, p. 1)(italics added) In other words, Softmart sells software, hardware and IT consulting services to its customers to solve information technology issues. (Vol. 1, 42:14-17, 84:10-22)

On her LinkedIn account, Mariani described Softmart as "a global provider of all things IT. From software to hardware to services, Softmart provides a complete solution for organizations in both the private and public sector." (N.T. Vol. 4, 133:20-134:15;

14

Exh. P-132) Mariani described her work with Softmart as: "Responsible for helping customers understand and manage their software licensing agreements and hardware procurements. We have an analytical approach to dissecting your agreements and presenting scenarios for moving forward. We reduce IT spend[ing] by helping you reduce overhead associated with purchasing managing produce. Sales professional certified by over 15 companies including Microsoft, Adobe, IBM, HP, Symantec and more." (Exh. P-132)

Mariani's employment agreement with Arraya states that Arraya is "engaged in the business of Information Technology, Computer Hardware Sales and Computer Software Sales." (Exh. P-1, p. 1) Mariani testified that she is engaged in selling products and solutions for Arraya. (N.T. Vol. 4, 135:22-136:3) On her LinkedIn profile, Mariani described her work on behalf of Arraya as "responsible for driving Arraya Solutions' technology portfolio, including products and solutions from top manufacturers including EMC, Cisco, VMware, Microsoft, and VCE Company, as well as Arraya's suite of 356+ Managed Services." (N.T. Vol. 4, 135:10-19; Exh. P-132) Arraya's business is the sale of software, hardware and consulting services. (N.T. Vol. 4, 142:14-143:10)

The parties each presented Venn diagrams to illustrate the overlap of products sold by Softmart and Arraya. As illustrated by Mariani, Softmart and Arraya both sell VMware, some Cisco, Microsoft Open, Eaton, APC, some IBM and EMC. These products, some of which are hardware and some of which are software, are the source of 80% of Arraya's annual revenue. (N.T. Vol. 4, 142:14-143:10; Exhs. P-127, D-63A) In comparison, Softmart revenues are 80% attributable to hardware, 15% to software and 5% to service. Softmart's top five hardware producers are HP, Dell, Lenovo, Cisco and Apple. Softmart's top four software producers are Microsoft, Adobe, VMware and Symantic. (N.T. Vol. 3, 9:15-21, 40:14-41:9, 41:16-20)

In addition to selling the same products and services, Softmart and Arraya compete for the same customers. If a customer calls Softmart first, Softmart's objective is to get as much of the business as it can handle, including bringing in a partner for which Softmart will be paid a referral fee. Similarly, if the customer calls Arraya first, Arraya's objective is to get as much of the business as it can handle and to bring in a partner for which it will be paid a referral fee only if necessary. (N.T. Vol. 4, 136:13-

15

138:5) Mariani agreed that the key to who gets the business is who the customer calls first. (N.T. Vol. 4, 137:17-19) Mariani conceded that when she was selling for Softmart in 2013, she was competing with Arraya. (N.T. Vol. 2, 197:8-13) Similarly, in March, 2014, when Mariani was exploring the potential for new business for Softmart in a discussion with her counterpart at Arraya, she learned that Arraya could not help her because Arraya was already selling a competing product to the targeted customer. (N.T. Vol. 4, 148:13-150:14; Exh. P-131) Finally, in July, 2014, when she was communicating with a Softmart customer on behalf of Arraya, Mariani compared Arraya's capacity to that of Softmart stating, "[l]ike I used to at Softmart, we do a lot of whiteboarding and helping customers start from square one of thought planning and design." (Exh. P-90)

Both Softmart and Arraya are in the business of solving the same types of technology issues for their customers; however, they differ in their approach. Softmart generally sells its customers products first and then up sells services using the access gained through product sales to establish a relationship of trust with its customer. ((N.T. Vol. 1, 45:8-21) Softmart will bring in a partner to provide services that it cannot provide in-house to insure that it is a one-stop shop. (N.T. Vol. 1, 58:5-59:22, Vol. 3, 14:23-5) Arraya approaches its customers as a consultant and then moves to product sales using the access gained through its consulting services. (N.T. Vol. 3, 177:16-178:4, 179:9-11) Both companies are selling the same hardware, software and related consulting services to business customers in Eastern Pennsylvania.

In Omicron Systems, the court held that two companies were competitors where one company sold a single computer program as a solution to the customer's needs and another company analyzed the needs of a customer, including marketing/sales needs, and provided the best solution possible, whether by creating a new program or utilizing existing software. Omicron Systems, Inc. v. Weiner, 860 A.2d at 560. In other words, even when two companies appear on their face to be different, if the two companies offer a solution to the same problem, they are competitors. Here, Softmart and Arraya are competitors because both are engaged in the business of selling computer hardware, software and related consulting services to business customers in

16

eastern Pennsylvania. Their approaches may be different, but both companies are engaged in the same business.

*Absence of Gingras and Lifshutz from trial*

Mariani complains that we erroneously drew an adverse inference from the absence of Gingras and Lifshutz from the preliminary hearing. Contrary to Mariani's assertion, no inference was drawn from their absence. During closing argument we questioned Mariani's attorney about their absence, which counsel reasonably explained. (N.T. Vol. 5, 47:3-49:11) Counsel misunderstood our concern, which was focused on whether Marini had the support of Arraya in these proceedings. Mariani noted several times in testimony that she had received support from Arraya, including payment of the cost of her defense, but she was uncertain as to how far Arraya's support would extend if injunctive relief was granted.

Having determined that Softmart has produced sufficient evidence to establish a clear right to relief on the claim for breach of the Restrictive Covenant Agreement, we consider the six prerequisites that must be fulfilled to obtain a preliminary injunction.

*1. Availability of damages as compensation*

Mariani maintains that any harm to Softmart is adequately compensable by money damages because mere loss of business, no matter how great, does not constitute irreparable harm. In fact, at our hearing, Softmart could show little in lost sales. However, "[i]t is not the initial breach of the covenant that establishes the existence of irreparable harm but rather the threat of unbridled continuation of the violation and the resultant incalculable damage to the former employer's business that constitutes the justification for equitable intervention." Bryant, 369 A.2d at 1167. The purpose of the Restrictive Covenant Agreement was to prevent more than just the sales that might result from Mariani's solicitation of Softmart's customers and prospects. The Restrictive Covenant Agreement was meant to "prevent disturbance in the relationship that has been established between [Softmart] and their accounts through prior dealings. It is the possible consequences of this unwarranted interference with customer relationships that is unascertainable and not capable of being fully compensated by money damages." Bryant, 369 A.2d at 1167. Where the interest sought to be protected is the relationship that had been established on behalf of the employer through the

17

efforts of the former sales employee, this interest is incapable of adequate protection by monetary damages and the use of injunctive relief is proper to avoid the threatened harm. Irreparable harm is likely to result when a sales employee resigns to work for a competitor, carrying with her the employer's goodwill, customer relationships, and confidential information. Nat'l Bus. Servs., Inc. v. Wright, 2 F. Supp. 2d 701, 709 (E.D. Pa. 1998); Fisher Bioservices, Inc. v. Bilcare, Inc., 2006 WL 1517382, 20 (E.D.Pa.,2006). Softmart entrusted Mariani with its confidential and proprietary information and gave her access to its business relationships. The relationships at issue represent significant investment by Softmart. Mariani has been compensated by Softmart for her role in creating and developing those relationships. These customer relationships are entitled to protection based upon the terms of the Restrictive Covenant Agreement.

2. *Greater injury from refusing than granting injunction; injunction will not substantially harm other interested parties*

"[T]he basic purpose behind the task of balancing the hardships to the respective parties is to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the party seeking the injunction." Prudential Ins. Co. of America v. Stella, 994 F. Supp. 308, 316-17 (E.D. Pa. 1998). The preliminary injunction we entered was tailored to abate only activity prohibited by the Restrictive Covenant Agreement. During the injunction period, Mariani is free to work in any capacity, including for Softmart's competitors, as long as she does not work in her former region, sell to certain of her former customers and prospects or use Softmart's confidential information. Furthermore, during this period, Arraya is free use another sales representative to sell within Mariani's region as well as to her former customers and prospects.

Mariani expressed concern about her ability to perform in a field sales position any distance from her Downingtown home, due to family demands on her time. (N.T. Vol. 4, 127:1-14) Mariani is the parent of two children under the age of three and at the time of the hearing was helping her husband with driving since his arm was in a cast. (N.T. Vol.4, 118:11-120:2, 126:20-24) Arraya's objective is to develop business within a 2-hour radius of Philadelphia. (N.T. Vol. 4, 129:11-23) While Gringas can redraw sales territories and reassign sales representatives for Arraya, each territory currently has a

18

sales representative assigned. (N.T. Vol. 4, 123:5-23, 125:23-126:19) Furthermore, the region assigned Mariani is more lucrative than other regions. (N.T. Vol. 4, 127:15-128:13, 151:2-15) Finally, Mariani expressed some uncertainty about the level of support she would be given by Arraya if injunctive relief were to be granted.

We considered the issues Mariani raised. We also considered that Mariani may have been operating under the misguided notion that the Restrictive Covenant Agreement would be unenforceable.[5] However, Mariani "does not have a right to the ideal job, but rather, to be able to earn a livelihood." Nat'l Bus. Servs., 2 F. Supp. 2d at 709. Working further from home may inconvenience Mariani or she may have a lower income due to assignment to a less lucrative area and Arraya may be inconvenienced by having to redraw and/or reassign sales territories; however, neither is irreparably harmed. Softmart will have its customer relationships further eroded unless Mariani is precluded from using Softmart's confidential information and from soliciting business opportunities from Softmart's customers. The harm Softmart will suffer due to Mariani's continued violation of the Restrictive Covenant Agreement is insidious and immeasurable. If Mariani is permitted to circumvent her contractual obligations, then the sanctity of the covenants Softmart has with other employees will be diminished and Softmart's ability to enforce these covenants will be curtailed. Graphic Management Associates, Inc. v. Hatt, 1998 WL 159035, *18 (E.D.Pa.,1998). On balance, the hardships weigh in favor of granting Softmart relief.

## 3. Restoration of status quo

The status quo to be maintained by preliminary injunction is the last actual, peaceable and lawful uncontested status which preceded the pending controversy. Valley Forge Historical Soc'y v. Washington Memorial Chapel, 493 Pa. 491, 426 A.2d

---

[5] Mariani had consulted with an attorney before she signed the Restrictive Covenant Agreement who, she stated, had advised her that she could sign the agreement because it was unenforceable. (N.T. Vol. 2, 213:19-21) Although Mariani says she believed the Restrictive Covenant Agreement was unenforceable, there is no evidence that she expressed this view when she gave a copy to Gingras and Lifshutz. Additionally, Mariani's position has been that when she began working for Arraya, she understood she could take no action to harm Softmart under the Restrictive Covenant Agreement, not that she was unrestrained by an unenforceable agreement.

19

1123, 1129 (1981). The preliminary injunction entered restores the status quo as it existed prior to Mariani's wrongful conduct.

4. *Likely to prevail on the merits.*

As discussed at length above, Softmart has demonstrated that it is likely to prevail on the merits.

5. *Injunction is reasonably suited to abate the offending activity*

The preliminary injunction we entered prohibits Mariani from acting contrary to the terms of her Restrictive Covenant Agreement. She must refrain from selling in her former regions and to certain other former customers and prospects. She is prohibited from using Softmart's confidential information. Mariani is free to otherwise engage is sales activities. The injunction is limited and reasonably suited to abate just the offending activity.

6. *No adverse affect to the public's interest*

The enforcement of restrictive covenants serves a number of public purposes, including discouraging unfair competition, the misappropriation and wrongful use of confidential information and the disavowal of freely contracted obligations. Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. Napolitano, 85 F. Supp. 2d 491,499 (E.D. Pa. 2000); Minnesota Mining & Mfg. Co. v. Gessner, 78 F. Supp. 2d 390, 393 (E.D. Pa. 1999); Nat'l Bus. Servs., Inc. v. Wright, 2 F. Supp. 2d 701, 709 (E.D. Pa. 1998); Graphic Mgmt. Associates, Inc. v. Hatt, No. 97-CV-6961, 1998 WL 159035, at *19 (E.D. Pa. Mar. 18, 1998). Arraya is free to compete with Softmart, but may not do so with Mariani as its representative in Eastern Pennsylvania, Georgia or with certain other former customers or prospects of Mariani. Mariani is free to work in sales, even selling the very same products she previously sold for Softmart, but may not do so for a limited period within her former regions or to certain other former customers or prospects or using or disclosing Softmart's confidential information. We can see no harm to the public by the enforcement of Mariani's lawful employment agreement.

Having determined that Softmart established all of the prerequisites entitling it to preliminary injunctive relief, we entered our Order on January 13, 2015.

Mariani raises an additional issue in her Statement of Matters Complained of on Appeal. Mariani claims that we erred by awarding attorneys' fees when we granted

20

preliminary injunctive relief. Softmart sought attorneys' fees under the terms of the Restrictive Covenant Agreement, which provides "I agree to indemnify Softmart for its attorneys' fees and costs incurred in enforcing the terms of this Agreement should I violate any of its terms." (Restrictive Covenant Agreement, p. 7) Our Order required Mariani

> to indemnify Softmart for its reasonable attorneys' fees and costs incurred in enforcing the terms of the Restrictive Covenant Agreement, as provided by the 'Attorneys' Fees' provision of the Restrictive Covenant Agreement. Softmart shall submit a fee petition to the Court within ten days of the entry of this Order. Any response thereto shall be due ten days thereafter.

(Order, pp. 3-4) Mariani argues that attorneys' fees are not properly awarded as part of preliminary injunctive relief.

Softmart commenced this action seeking relief for breach of contract and injunctive relief and therefore had made a claim for legal and equitable relief. A court in equity has jurisdiction to award damages, in addition to providing for equitable relief. Puleo v. Thomas, 425 Pa.Super. 285, 290, 624 A.2d 1075, 1078 (Pa.Super.,1993). Two cases cited by Mariani, Holiday Lounge, Inc. v. Shaler Enterprises Corp., 441 Pa. 201, 272 A.2d 175 (1971) and Martindale Lumber Co. v. Trusch, 452 Pa.Super. 250, 681 A.2d 802 (1996), were reversed when damages were awarded as part of equitable relief because the reviewing courts found that money damages had not been pled. However, we have been unable to find a case in which attorneys' fees were awarded as part of preliminary injunctive relief. In our case, we made the award believing that doing so would promote the efficient resolution of claims. Nonetheless, when Mariani's counsel raised this issue by correspondence after entry of our Order, we responded by email on February 10, 2015 and notified all parties that we would proceed to a final injunctive hearing and enter a final order before addressing counsel fees. Therefore, despite the provision in the Order, we had already advised counsel that we would not proceed as stated prior to the date that Mariani filed her appeal.

BY THE COURT:

DATE: 4/21/15

_____
Edward Griffith, J.

21