J-A21019-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| RULLEX CO., LLC, INCORRECTLY DESIGNATED AS RULLEX, INC. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 1171 EDA 2018 |
| TEL-STREAM, INC. AND YURI KARNEI | : | |

Appeal from the Order Entered April 5, 2018
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  180200961

BEFORE:  PANELLA, J., OLSON, J., and McLAUGHLIN, J.

MEMORANDUM BY OLSON, J.:                    **FILED JANUARY 11, 2019**

Appellant, Rullex Co., LLC, appeals from the order entered on April 5, 2018 in the Civil Division of the Court of Common Pleas of Philadelphia County that denied its request for preliminary injunctive relief preventing Tel-Stream, Inc. and Yuri Karnei (collectively Tel-Stream) from competing with Appellant, soliciting Appellant's customers within a non-solicitation region, and misappropriating Appellant's trade secrets.[1]  We affirm.

The trial court made the following findings of fact.

**A.  The Parties**

---

[1] "An appeal may be taken as of right and without reference to Pa.R.A.P. 341(c) [(final orders)] from … [a]n order that grants or denies, modifies or refuses to modify, continues or refuses to continue, or dissolves or refuses to dissolve an injunction[.]"  Pa.R.A.P. 311(a)(4).

1. [Appellant] is a Pennsylvania company that provides telecommunications construction services, such as installing equipment on cellular towers for clients including Nokia, Ericsson, Verizon, and AT&T.

2. [Tel-Stream] is a company formed by Mr. Karnei in mid-2016 to provide labor crews to businesses that service cellular towers.

## B. The Non-Compete Agreement

3. Rullex and Tel-Stream entered into a Master Service Agreement for Construction ("Master Service Agreement"), dated February 5, 2016, pursuant to which Tel-Stream would provide telecommunications construction services.

4. On the same day, Rullex and Tel-Stream entered into a Subcontractor Non-Disclosure, Non-Solicitation, and Developments Agreement (the "Agreement").

5. The Agreement defines "Proprietary Information" as "information or material which is not generally available to the public," including "customer identities or other information about customers, prospect identities or other information about prospects[.]"

6. The Agreement provides that during or after the duration of its relationship with Rullex, Tel-Stream would not "disclose any Proprietary Information to anyone outside of the Company [Rullex], or use or permit to be used any Proprietary Information for any purpose[.]"

7. Tel-Stream further agreed that, for 24 months following the termination of the Agreement, it would not solicit Rullex customers. The Agreement provides:

   [During Subcontractor's relationship with the Company and for a period of twenty-four (24) months following the termination of this Agreement for any reason (the "Restricted Period"), Subcontractor agrees not to, either individually or jointly, directly or indirectly, either as an [sic] Subcontractor, employer, operator, agent, independent contractor, owner, consultant, partner, investor or otherwise, (i) offer to provide and/or provide any products or services that compete (whether directly or indirectly) with the products and serviced

offered or planned to be offered by the Company from time to time to any actual or prospective customer of the Company (A) who was serviced by Subcontractor, (B) about whom Subcontractor obtained Proprietary Information, or (C) with whom Subcontractor otherwise has dealt while employed by the Company (collectively, a "Rullex Customer")[.]

8. In addition, Tel-Stream agreed it would not compete with Rullex. The Agreement provides:

[D]uring Subcontractor's relationship with the Company and for a period of (24) months following the termination of this Agreement for any reason (the "Restricted Period"), Subcontractor agrees not to, either individually or jointly, directly or indirectly, either as an [sic] Subcontractor, employers, operator, agent, independent contractor, owner, consultant, partner, investor or otherwise, in any manner offer to perform services for, or engage in, any business that provides services that are directly competitive with those provided by the Company within the same geographic territory of a 200 mile radius of each site where Subcontractor performed work for the Company during this Agreement[.]

9. In addition, Tel-Stream agreed that any breach of the Agreement "will irreparably and continually damage the Company in such a manner that money damages will not be a sole adequate remedy."

10. Finally, Tel-Stream acknowledged that it had the opportunity to seek the advice of independent legal counsel and that it had read and understood all the terms and provisions of the Agreement.

## C. Procedural History

11. On February 13, 2018, Rullex filed a complaint against Tel-Stream and Mr. Karnei, alleging that, in violation of the Agreement, Tel-Stream in late 2017 began working as a subcontractor for Invertice, Inc. ("Invertice"), a company that previously had employed Rullex as a subcontractor.

12. On February 14, 2018, Rullex filed its Motion for a Temporary Preliminary Injunction.

- 3 -

13. The Court issued a rule to show cause on February 16, 2018, and held an evidentiary hearing on February 27, 2018.

## D. The Tel-Stream Rullex Relationship

14. Tel-Stream started working for Rullex in January or February 2016, according to the testimony of Rullex's Vice President and 50 percent shareholder Alex Aliakhnovich, who testified at the preliminary injunction hearing.

15. Mr. Aliakhnovich admitted that the Agreement was signed "a couple of months" after Tel-Stream started to perform work for Rullex.

16. Mr. Aliakhnovich testified that Invertice is Rullex's strongest competitor in Pennsylvania. He testified that Tel-Stream's president, [Mr.] Karnei, became aware of Invertice through Rullex.

17. Mr. Aliakhnovich further testified that in late 2017 Tel-Stream began performing work for Invertice.

18. Rullex's business model involved hiring subcontractors such as Tel-Stream to provide the labor for the telecommunications construction Fullex was hired to perform. Rullex's customers were unaware that subcontractors were used. Mr. Aliakhnovich testified that Rullex's customers thought that Mr. Karnei and the Tel-Stream workers were part of Rullex.

19. Mr. Aliakhnovich further readily testified in open court about the identity of many of Rullex's customers.

20. Mr. Karnei's testimony contradicted the testimony of Mr. Aliakhnovich. Mr. Karnei testified that, while Tel-Stream started working for Rullex in June or July 2016, neither the Master Service Agreement nor the Agreement was signed until early 2017.

21. Mr. Karnei further testified that his native language is Russian; he does not understand written English well; and that he signed the Master Service Agreement and Agreement after they were explained to him page by page by Rullex President Russell Razhko.

22. Mr. Karnei and Mr. Razhko were both born in Belarus.

23. Mr. Karnei testified that he trusted Mr. Razhko as a countryman with whom he previously had worked. Based on Mr. Razhko's explanation of the Agreement, Mr. Karnei understood that Tel-Stream was free to perform work for any customers if Rullex did not work with them.

24. Mr. Karnei also testified that Invertice contacted him in December 2017 and asked him if he could work for the company. Mr. Karnei testified he had never worked with Invertice when he was working for Rullex. He further testified that he informed Rullex in January 2018 that he was performing work for Invertice.

Trial Court Opinion, 4/5/18, at 1-5 (footnotes and record citations omitted).

Appellant raises two claims for our review:

1. Did the trial court err in its interpretation of Pennsylvania law when it determined that the restrictive covenants were not enforceable because they were signed after [Tel-Stream's] first day of employment, despite being provided evidentiary proof that the covenants were created prior to [Tel-Stream's] first day?

2. Did the trial court err when it immediately denied Rullex's emergency motion for reconsideration despite being presented with: (a) affidavit testimony which explained the history between the parties and the justifiable absence of Rullex's 50% owner and signatory, Russel Razhko, from the evidentiary hearing, (b) evidence in the form of an e-mail dated in January 2016 providing proof of the creation of the restrictive covenants prior to the inception of Tel-Stream's employment, and (c) relevant Pennsylvania case law which specifically indicated that the interpretation of "ancillary to employment" should not be narrowly construed?

Appellant's Brief at 5.

Appellant's claims challenge the trial court's order denying entry of a preliminary injunction. Our review of such claims is well settled.

> [A]n appellate court reviews an order granting or denying a preliminary injunction for an abuse of discretion. **Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.**, 828 A.2d 995, 1000 (Pa. 2003). Under this highly deferential standard of review, an appellate court does not inquire into the merits of the controversy, but examines the record "to determine if there were any apparently reasonable grounds for the action of the [trial court]." **Id.**, quoting **Roberts v. Board of Dirs. of Sch. Dist.**, 341 A.2d 475, 478 (Pa. 1975)). "Apparently reasonable grounds" exist to support a lower court's denial of injunctive relief where the lower court has properly found that any one of the six "essential prerequisites" for a preliminary injunction is not satisfied. **Id.** at 1002. [Our] scope of review in preliminary injunction matters is plenary. **Warehime v. Warehime**, 860 A.2d 41, 46 n.7 (Pa. 2004).

> The six essential prerequisites that a moving party must demonstrate to obtain a preliminary injunction are as follows: (1) the injunction is necessary to prevent immediate and irreparable harm that cannot be compensated adequately by damages; (2) greater injury would result from refusing the injunction than from granting it, and, concomitantly, the issuance of an injunction will not substantially harm other interested parties in the proceedings; (3) the preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; (4) the party seeking injunctive relief has a clear right to relief and is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and, (6) the preliminary injunction will not adversely affect the public interest. [**Warehime**, 860 A.2d at 46–47, citing **Summit Towne Centre**, Inc., 828 A.2d at 1001].

**SEIU Healthcare Pennsylvania v. Commonwealth**, 104 A.3d 495, 501-502 (Pa. 2014) (footnote in original quote incorporated into body of text; parallel citations omitted).

Here, the trial court determined that Appellant was not entitled to injunctive relief since it failed to establish an enforceable restrictive covenant and because Appellant failed to show that Tel-Stream threatened its protected interests. Appellant raises two challenges to these assessments. First, Appellant argues that Pennsylvania law permits the enforcement of restrictive covenants that are ancillary to an agreement; hence, the non-compete agreement between the parties in this case is enforceable. Appellant also claims that the trial court erred in refusing to consider Appellant's goodwill and customer relationships as protected interests. For these reasons, Appellant asks this Court to enter a preliminary injunction prohibiting Tel-Stream from soliciting customers and working with Appellant's competitors within the designated non-solicitation region. We disagree and conclude that the trial court had reasonable grounds to reject injunctive relief.

> [C]urrently in Pennsylvania, restrictive covenants are enforceable only if they are: (1) ancillary to an employment relationship between an employee and an employer; (2) supported by adequate consideration; (3) the restrictions are reasonably limited in duration and geographic extent; and (4) the restrictions are designed to protect the legitimate interests of the employer. [**Hess v. Gebhard & Co. Inc.**, 808 A.2d 912, 917 (Pa. 2002)]; **Piercing Pagoda, Inc. v. Hoffner**, 351 A.2d 207, 210 (Pa. 1976); [**Morgan's Home Equip. Corp. v. Martucci**, 136 A.2d 838, 844-846 (Pa. 1957)].
>
> As with other contracts, for an employment agreement containing a restrictive covenant to be enforced, consideration is crucial, whether the covenant is entered into prior to, during, or after employment ends. Thus, to be valid, a covenant not to compete must be consummated with the exchange of consideration. **Capital Bakers Inc. v. Townsend**, 231 A.2d 292, 293–294 (Pa. 1967) (restrictive covenant in employment contract executed 12

- 7 -

years after the start of employment was unenforceable for lack of consideration).  If a noncompetition clause is executed at the inception of the employment, the consideration to support the covenant may be the award of the position itself.  *Barb–Lee Mobile Frame Co. v. Hoot*, 206 A.2d 59, 61 (Pa. 1965); *Morgan's*, 136 A.2d at 845 (holding covenant not to compete may be enforceable if contained in an employment agreement executed upon the "taking of employment").  However, a restrictive covenant is not required to be included in the initial employment contract to be valid.  *Jacobson & Co. v. Int'l. Environment Corp.*, 235 A.2d 612, 618 (Pa. 1967); *see generally* Jordan Liebman and Richard Nathan, The Enforceability of Post–Employment Noncompetition Agreements Formed After At–Will Employment Has Commenced: The "Afterthought" Agreement, 60 S. Cal. L.Rev. 1465 (1987).  There are legitimate reasons for this, including the development of a worker's expertise, but only after employment for a period of time:

> [I]n many instances, … the insertion of a restrictive covenant in the original contract would serve no valid purpose. An employer who hires a novice has no desire to restrict his present competitive force.  Only when the novice has developed a certain expertise, which could possibly injure the employer if unleashed competitively, will the employer begin to think in terms of the protection of a restrictive covenant.

*Jacobson & Co.*, 235 A.2d at 618.

When a non-competition clause is required after an employee has commenced his or her employment, it is enforceable only if the employee receives "new" and valuable consideration—that is, some corresponding benefit or a favorable change in employment status. [*See Pulse Technologies, Inc. v. Notaro*, 67 A.3d 778, 781-782 (Pa. 2013)].  Sufficient new and valuable consideration has been found by our courts to include, *inter alia*, a promotion, a change from part-time to full-time employment, or even a change to a compensation package of bonuses, insurance benefits, and severance benefits.  Without new and valuable consideration, a restrictive covenant is unenforceable.  *Maintenance Specialties Inc. v. Gottus*, 314 A.2d 279, 281 (Pa. 1974).  More specifically, the mere continuation of the employment relationship at the time of entering into the restrictive covenant is insufficient to serve as consideration for the new covenant, despite it being an at-will relationship terminable by either party.  *Pulse Technologies,*

> *Inc.*[, *supra.*]; *George W. Kistler, Inc. v. O'Brien*, 347 A.2d 311, 316 (Pa. 1975) (plurality).
>
> In sum, while at common law, covenants in restraint of trade have long been disfavored by Pennsylvania courts, an agreement containing a non-compete clause will be upheld, if, among other considerations, it is supported by adequate consideration. In the context of requiring an employee to agree to a restrictive covenant mid-employment, however, such a restraint on trade will be enforceable only if new and valuable consideration, beyond mere continued employment, is provided and is sufficient to support the restrictive clause.

*Socko v. Mid-Atlantic Syaytems of CPA, Inc.*, 126 A.3d 1266, 1274-1276 (Pa. 2015).

Applying these principles to the record before us, we agree with the trial court that Appellant has not shown that the restrictive covenant in the parties' agreement was enforceable. It is not disputed that Tel-Stream's work commenced before the parties executed the written contract upon which Appellant now relies. Appellant's own witnesses confirm that, while the parties discussed many terms at the inception of their relationship and before Tel-Stream's work commenced, these discussions formed part of ongoing negotiations and were subject to amendment and alteration. ***See e.g.*** Appellant's Brief at 8, *quoting* Testimony of Alexey Aliakhnovich (advising Mr. Karnei to "take a look at the contract" and "[i]f you do not agree with something, you could tell us and we can change that before signing[]"). References to non-compete clauses found in unsigned draft agreements are

not binding on the parties.[2] Thus, since the written contract upon which Appellant relies was executed **after** Tel-Stream commenced work, the trial court correctly determined that new and valuable consideration, beyond mere continued work, was needed to support the restrictive covenant. Appellant has not come forward with evidence of such new and valuable consideration beyond the original award of cellular tower work. Thus, Appellant is unlikely to succeed based on any claim asserting an enforceable restrictive covenant.

We also agree that Appellant failed to establish that Tel-Stream possessed Appellant's trade secrets or that Appellant's customer lists were proprietary. Appellant essentially raises no challenge to the trial court's determination that installation of telecommunications equipment does not involve techniques that are proprietary to Appellant. Moreover, the record reflects that Mr. Aliakhnovich, Appellant's sole witness at the preliminary injunction hearing, readily identified Appellant's customers in open court without a request to protect that information as confidential.[3] For these reasons, Appellant is not entitled to relief.

---

[2] In fact, the written agreement between the parties contains an integration clause stating the written contract "supersedes all prior understandings and agreements between the parties hereto regarding the subject matter hereof." Complaint, 2/13/18, at Exhibit A p. 22 para. 13.7.

[3] Appellant notes that counsel objected before Mr. Aliakhnovich identified the customers in open court. While this is technically correct, counsel's objection referred to the burden of listing Appellant's customers, not the proprietary nature of their identity.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>1/11/19</u>